No. 24-1822

# In the United States Court of Appeals for the Fourth Circuit

---

KAREN LOWY, individually and as parent and next friend of N.T., AND ANTONIO HARRIS, PLAINTIFFS-APPELLANTS

*v.*

DANIEL DEFENSE, LLC, et al., DEFENDANTS-APPELLEES

and

STARLINE, INC. AND JOHN DOES 1–20, DEFENDANTS

---

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA (NOS. 23-1338 & 23-1501) (THE HONORABLE CLAUDE M. HILTON, J.)*

---

**BRIEF OF APPELLANTS**

---

KATHRYN M. ALI
ELIZABETH C. LOCKWOOD
MEGHAN PALMER
ALI & LOCKWOOD LLP
  *501 H Street NE, Suite 200*
  *Washington, DC 20002*
  *(202) 651-2476*
  *katie.ali@alilockwood.com*

H. CHRISTOPHER BOEHNING
JACOBUS J. SCHUTTE
JENIFER N. HARTLEY
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
  *1285 Avenue of the Americas*
  *New York, NY 10019-6064*
  *(212) 373-3700*
  *cboehning@paulweiss.com*

*Counsel for Appellants Karen Lowy, individually and as parent and next friend of N.T., and Antonio Harris*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................1

STATEMENT OF JURISDICTION ...............................................................2

STATEMENT OF THE ISSUES .....................................................................2

STATEMENT OF THE CASE .........................................................................4

    A.  Factual History ......................................................................................4

        1.  Raymond Spencer Builds His Arsenal of Defendants'
            Products. ........................................................................................4

        2.  The Shooting and Its Aftermath. ...............................................5

        3.  Daniel Defense, FAB Manufacturing and FAB Defense,
            BCM, SOLGW, FosTecH, Griffin Armament, and
            Centurion Arms Design and Market Weapons of War to
            Civilians .........................................................................................8

    B.  Procedural History ...............................................................................17

SUMMARY OF ARGUMENT .....................................................................18

STANDARD OF REVIEW .............................................................................20

ARGUMENT .....................................................................................................22

I.  Plaintiffs Have Article III Standing ...........................................................22

    A.  At This Early Stage, Article III Imposes Only a "Relatively
        Modest" Burden ...................................................................................23

    B.  Defendants' Conduct Had a Predictable, and Even a
        Determinative or Coercive, Effect on the Shooter ................................25

        1.  Plaintiffs Have Plausibly Alleged That Defendants'
            Marketing Practices Had a Predictable Effect on the
            Shooter. ........................................................................................27

        2.  Plaintiffs Have Also Plausibly Pled That Defendants'
            Marketing Practices Had a Determinative or Coercive
            Effect on the Shooter ..................................................................31

II.  The Protection of Lawful Commerce in Arms Act ("PLCAA") Does
    Not Bar Plaintiffs' Actions .........................................................................38

A. PLCAA Does Not Apply to Daniel Defense, Magpul, Surefire, or Torkmag, Who Supplied the Shooter With the Rifle Magazines He Used to Execute His Attack..........................................39

    1. Rifle Magazines Are Not Component Parts, Because They Are Not Essential to a Firearm..........................................40

    2. Regardless of the Status of Magazines, Magpul, Surefire, and Torkmag Are Not PLCAA-Eligible Manufacturers or Sellers of a Qualified Product..........................................47

B. Plaintiffs' Claims Are Exempt From PLCAA..........................................49

    1. PLCAA's Predicate Exception Permits Plaintiffs' Action to Proceed..........................................51

    2. PLCAA's Negligence Per Se Exception Also Authorizes Plaintiffs' Action Against Daniel Defense, Bravo Company, FosTecH, Griffin Armament, Centurion Arms, and SOLGW..........................................63

C. The District Court Erred in Dismissing FAB Defense, FAB Manufacturing, and Torkmag on PLCAA Grounds When They Did Not Raise PLCAA, and in Dismissing Mr. Harris's Claims Against FAB Manufacturing Absent a Proper Motion..........................................64

CONCLUSION ..........................................65

STATEMENT REGARDING ORAL ARGUMENT..........................................67

CERTIFICATE OF COMPLIANCE WITH TYPEFACE AND WORD COUNT LIMITATIONS..........................................68

CERTIFICATE OF SERVICE ..........................................69

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aarow Elec. Sols.* v. *Tricore Sys., LLC,*
  693 F. Supp. 3d 525 (D. Md. 2023)............................................................24

*Ahern Rentals, Inc.* v. *EquipmentShare.com, Inc.,*
  59 F.4th 948 (8th Cir. 2023).....................................................................33

*Alvarez* v. *Becerra,*
  2023 WL 2908819 (4th Cir. Apr. 12, 2023)..............................................35

*Ashcroft* v. *Iqbal,*
  556 U.S. 662 (2009) ...................................................................................21

*Ateres Bais Yaakov Acad. of Rockland* v. *Town of Clarkstown,*
  88 F.4th 344 (2d Cir. 2023).......................................................................27

*Bennett* v. *Spear,*
  520 U.S. 154 (1997) .........................................................................24, 26, 37

*Bianchi* v. *Brown,*
  111 F.4th 438 (4th Cir. 2024) (en banc) ...................................30, 31, 58

*Brady* v. *Walmart, Inc.,*
  2022 WL 2987078 (D. Md. July 28, 2022).............................................36, 53

*Braun* v. *Soldier of Fortune Magazine, Inc.,*
  968 F.2d 1110 (11th Cir. 1992)..................................................................62

*Bryan* v. *United States,*
  524 U.S. 184 (1998) ...................................................................................56

*Bryant-Bush* v. *Shawnee Gun Shop, Inc.,*
  2011 WL 13177539 (W.D. Mo. Mar. 29, 2011)........................................46

*United States* v. *Bursey,*
  416 F.3d 301 (4th Cir. 2005) .....................................................................56

iii

*Cain* v. *Vontz,*
    703 F.2d 1279 (11th Cir. 1983)............................................................61

*Chiapperini* v. *Gander Mountain Co., Inc.,*
    13 N.Y.S.3d 777 (N.Y. Sup. Ct. 2014)............................................63

*City of New York* v. *Beretta U.S.A. Corp.,*
    524 F.3d 384 (2d Cir. 2008)..............................................................55

*Colon Health Ctrs. of Am., LLC* v. *Hazel,*
    733 F.3d 535 (4th Cir. 2013).............................................................21

*Conn. Nat'l Bank* v. *Germain,*
    503 U.S. 249 (1992)...........................................................................50

*Corporan* v. *Wal-Mart Stores E., LP,*
    2016 WL 3881341 (D. Kan. July 18, 2016).................................36, 51

*Dep't of Com.* v. *New York,*
    588 U.S. 752 (2019).................................................................*passim*

*DiCocco* v. *Garland,*
    52 F.4th 588 (4th Cir. 2022)...............................19, 23, 24, 26

*Doyle* v. *Combined Sys., Inc.,*
    2023 WL 5945857 (N.D. Tex. Sept. 11, 2023)...............................54

*Estados Unidos Mexicanos* v. *Smith & Wesson Brands, Inc.,*
    633 F. Supp. 3d 425 (D. Mass. 2022), *rev'd in part on other
    grounds,* 91 F.4th 511 (1st Cir.), *cert. granted,* No. 23-1141,
    2024 WL 4394115 (Oct. 4, 2024) ..............................................28, 60

*FDA* v. *All. for Hippocratic Med.,*
    602 U.S. 367 (2024)...........................................................................22

*Gallimore* v. *Commonwealth,*
    436 S.E.2d 421 (Va. 1993).................................................................59

iv

*Green* v. *Kyung Chang Indus. USA Inc.*,
 2022 WL 987555 (Nev. Dist. Ct. Mar. 23, 2022), *mandamus
 denied, Kyung Chang Indus. USA Inc.* v. *Eighth Jud. Dist.
 Ct.*, 525 P.3d 836 (Nev.), *cert. denied*, 144 S. Ct. 98 (2023)...................... 43, 44

*Hines* v. *Garrett*,
 108 S.E. 690 (Va. 1921) .......................................................................... 61

*Ileto* v. *Glock, Inc.*,
 565 F.3d 1126 (9th Cir. 2009) ........................................................... 48, 55

*Indus. Servs. Grp., Inc.* v. *Dobson*,
 68 F.4th 155 (4th Cir. 2023)................................................................... 36

*Jones* v. *Mean, LLC*,
 No. 810316/2023, slip op. (N.Y. Sup. Ct. Feb. 22, 2024) ................................. 42

*Kashdan* v. *George Mason Univ.*,
 70 F.4th 694 (4th Cir. 2023).................................................................. 34

*Kerns* v. *United States*,
 585 F.3d 187 (4th Cir. 2009) ................................................................ 22

*King* v. *Klocek*,
 187 A.D.3d 1614 (N.Y. App. Div. 2020)....................................................... 51

*United States* v. *Lanning*,
 723 F.3d 476 (4th Cir. 2013) ................................................................ 40

*Lansdowne on the Potomac Homeowners Ass'n, Inc.* v.
 *OpenBand at Lansdowne, LLC*,
 713 F.3d 187 (4th Cir. 2013) ................................................................ 31

*Libertarian Party of Va.* v. *Judd*,
 718 F.3d 308 (4th Cir. 2013) ................................................................ 27

*Lujan* v. *Defs. of Wildlife*,
 504 U.S. 555 (1992) ....................................................................... 23, 32

*Maroulis* v. *Elliott*,
 151 S.E. 2d 339 (Va. 1966)................................................................... 57

v

*Minnesota* v. *Fleet Farm LLC*,
  679 F. Supp. 3d 825 (D. Minn. 2023) .......................................................51

*Mylan Lab'ys, Inc.* v. *Matkari*,
  7 F.3d 1130 (4th Cir. 1993).......................................................... 21, 46

*In re Nat'l Prescription Opiate Litig.*,
  452 F. Supp. 3d 745 (N.D. Ohio 2020).......................................................62

*Overbey* v. *Mayor of Balt.*,
  930 F.3d 215 (4th Cir. 2019) .......................................................24

*Prescott* v. *Slide Fire Sols., LP*,
  410 F. Supp. 3d 1123 (D. Nev. 2019)................................................ 36, 54

*Prescott* v. *Slide Fire Solutions, LP*,
  341 F. Supp. 3d 1175 (D. Nev. 2018)................................................ 41, 42

*Ransom* v. *FIA Card Servs., N.A.*,
  562 U.S. 61 (2011)................................................................ 52, 53

*RGR, LLC* v. *Settle*,
  764 S.E.2d 8 (Va. 2014)............................................................ 20, 63

*Rich* v. *Commonwealth*,
  793 S.E.2d 798 (Va. 2016).......................................................57

*Ridenour* v. *Multi-Color Corp.*,
  147 F. Supp. 3d 452 (E.D. Va. 2015).......................................................33

*Robertson* v. *Sea Pines Real Est. Cos., Inc.*,
  679 F.3d 278 (4th Cir. 2012) .......................................................... 21, 24

*Russo* v. *United States*,
  37 F. Supp. 2d 450 (E.D. Va. 1999).......................................................59

*Semler* v. *Psychiatric Inst. of D.C.*,
  538 F.2d 121 (4th Cir. 1976) .......................................................63

*In re September 11 Litigation*,
  280 F. Supp. 2d 279 (S.D.N.Y. 2003)................................................ 60, 61

*Sierra Club* v. *U.S. Dep't of the Interior*,
  899 F.3d 260 (4th Cir. 2018) ....................................................26

*Simon* v. *Eastern Kentucky Welfare Rights Organization*,
  426 U.S. 26 (1976)..........................................................34, 35

*Smith & Wesson Corp.* v. *City of Gary*,
  875 N.E.2d 422 (Ind. Ct. App. 2007)......................................53

*Soto* v. *Bushmaster Firearms Int'l, LLC*,
  202 A.3d 262 (Conn.), *cert. denied, Remington Arms Co., LLC*
  v. *Soto*, 140 S. Ct. 513 (2019) ...................................38, 53, 54

*Tobey* v. *Jones*,
  706 F.3d 379 (4th Cir. 2013) ..................................................21

*United Source One, Inc.* v. *Frank*,
  2024 WL 1108824 (4th Cir. Mar. 14, 2024) ...........................64

*Uzuegbunam* v. *Preczewski*,
  141 S. Ct. 792 (2021)..............................................................23

*Vaughn* v. *Perea*,
  2021 WL 5879176 (4th Cir. Dec. 13, 2021)............................24

*White Tail Park, Inc.* v. *Stroube*,
  413 F.3d 451 (4th Cir. 2005) ..................................................22

*Wikimedia Found.* v. *Nat'l Sec. Agency*,
  857 F.3d 193 (4th Cir. 2017) ..................................................24

*Williams* v. *Beemiller, Inc.*,
  100 A.D.3d 143 (N.Y. App. Div. 2012).....................................51

*Williams* v. *Kincaid*,
  45 F.4th 759 (4th Cir. 2022)..............................................20, 21

*Williams* v. *Le*,
  662 S.E.2d 73 (Va. 2008).........................................................57

*Woods* v. *Steadman's Hardware, Inc.*,
  2013 WL 709110 (D. Mont. Feb. 26, 2013).............................63

**Statutes**

15 U.S.C. § 7901(a)(4) ........................................................................54

15 U.S.C. § 7901(b)(1) ........................................................................38

15 U.S.C. § 7902(a) ........................................................................50

15 U.S.C. § 7903(2) ........................................................................47, 48, 49

15 U.S.C. § 7903(4) ........................................................................*passim*

15 U.S.C. § 7903(5) ........................................................................50

15 U.S.C. § 7903(5)(A) ........................................................................*passim*

15 U.S.C. § 7903(5)(A)(ii) ........................................................3, 39, 49, 63

15 U.S.C. § 7903(5)(A)(iii) ........................................................*passim*

15 U.S.C. § 7903(5)(D) ........................................................................51

15 U.S.C. § 7903(6) ........................................................................47, 48, 49

18 U.S.C. § 921(a)(3) ........................................................................43

18 U.S.C. § 921(a)(3)(C) ........................................................................41

26 U.S.C. § 5841(b) ........................................................................54

26 U.S.C. § 5845(j) ........................................................................54

28 U.S.C. § 1291 ........................................................................2

28 U.S.C. § 1332 ........................................................................2

Ill. Comp. Stat. 5/1.2bb ........................................................................45

Ill. Comp. Stat. 5/2.25 ........................................................................45

National Firearms Act,
  26 U.S.C. § 5801 *et seq.* ........................................................................*passim*

Protection of Lawful Commerce in Arms Act,
15 U.S.C. § 7901 *et seq.*........................................................................*passim*

Va. Code Ann. § 18.2–216(A) .....................................................................53

Va. Code Ann. § 18.2–288 ...........................................................................54

Va. Code Ann. § 18.2–294 ...........................................................................54

Va. Code Ann. § 59.1–198 ...........................................................................53

Va. Code Ann. § 59.1–200 ...........................................................................53

Virginia Consumer Protection Act,
Va. Code Ann. § 59.1–196 *et seq.* ......................................................*passim*

Virginia False Advertising Statute,
Va. Code Ann. § 18.2–216 *et seq.* ......................................................*passim*

Virginia Uniform Machine Gun Act,
Va. Code Ann. § 18.2–288 *et seq.* ......................................................*passim*

**Other Authorities**

*Component*, Am. Heritage Dictionary,
https://www.ahdictionary.com/word/search.html?q=componen
t (last visited Oct. 26, 2024) .................................................................40

*Component*, Merriam-Webster, https://www.merriam-
webster.com/dictionary/component (last visited Oct. 26, 2024).....................40

*Constituent*, Merriam-Webster, https://www.merriam-
webster.com/dictionary/constituent (last visited Oct. 26, 2024) ..................40

*Element*, Am. Heritage Dictionary,
https://www.ahdictionary.com/word/search.html?q=element
(last visited Oct. 26, 2024) .....................................................................40

Fed. R. Civ. P. 2 ..........................................................................................50

Fed. R. Civ. P. 12(b)(1)................................................................................22

Fed. R. Civ. P. 12(b)(6)......................................................................20, 22, 46

ix

*Green* v. *Kyung Chang Indus. USA Inc.*,
   Mot. to Dismiss Hr'g Tr. (Jan. 18, 2022) ...............................................45

Mem. re: Comm.'s Investigation into Gun Indus. Practices &
   Profits, 116 Cong. H. Comm. Oversight & Reform (2022) ...........................30

Wright & Miller, Federal Practice & Procedure § 1224
   (4th ed. 2024)..............................................................................................24

## PRELIMINARY STATEMENT

Plaintiffs-Appellants Karen Lowy and Antonio Harris were gunned down outside of a school in Washington, D.C. by a shooter barricaded in a sniper's lair equipped with weapons and equipment of war designed for use on a battlefield—not in an apartment, on a hunting trip, or even at a shooting range. During the shooting, Ms. Lowy's daughter N.T. huddled in fear inside the school, hoping to escape and wondering whether her mother was safe. N.T. would not get those answers for hours. When she did, the news was tragic. Ms. Lowy and Mr. Harris were gravely injured, and they and their families continue to suffer the effects of the shooting to this day.

Now, Defendants-Appellees say "not our fault." But the shooter here did exactly as Defendants encouraged in their marketing and advertising. He purchased Defendants' weapons and tools of war and then used them to hunt civilians in a military-style mission just like those depicted in Defendants' marketing. And Defendants continued their illegal marketing practices despite knowing that over and over again ordinary American citizens doing tasks that should bring them joy, not fear of death—like picking up a child from school, attending religious services, or watching a holiday parade—are being maimed or slaughtered in ways that mirror their advertising's imagery

1

and messaging. At this early stage of the case, it was too soon for the district court to decide that Defendants cannot possibly be held accountable.

Defendants cannot continue to arm and condition impressionable young men like the shooter yet feign surprise when they act in ways that mirror Defendants' marketing or say, "but we didn't pull the trigger." Defendants must answer for their conduct in a court of law just like any other seller does when their product foreseeably causes serious injury. This Court should reverse the dismissal of Plaintiffs' complaints.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1332 because no Defendant is a citizen of the same state as any Plaintiff[1] and the amount in controversy exceeds $75,000. The district court entered an order dismissing Plaintiffs' claims against all Defendants on July 24, 2024. Plaintiffs timely filed a notice of appeal on August 22, 2024. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the district court erred in concluding that Plaintiffs failed to allege an injury fairly traceable to Defendants' unlawful conduct sufficient to

---

[1] Ms. Lowy, N.T., and Mr. Harris are citizens of Maryland. JA37, JA124. No Defendant is a citizen of Maryland. JA37.

confer Article III standing at the pleading stage, where Plaintiffs alleged that Defendants' deceptive and dangerous advertising was at least partly responsible for the injuries they suffered.

2. Whether the district court erred in dismissing Plaintiffs' claims against Daniel Defense, LLC ("Daniel Defense"), Magpul Industries Corporation ("Magpul"), Surefire, LLC ("Surefire"), and Torkmag, Inc. ("Torkmag"), based on the Protection of Lawful Commerce in Arms Act ("PLCAA"), even though these Defendants are not "manufacturer[s] or seller[s] of a qualified product" under PLCAA.  *See* 15 U.S.C. § 7903(4), (5)(A).

3. Whether the district court erred in concluding that Plaintiffs failed to allege proximate cause sufficient to invoke (i) the predicate exemption to PLCAA, which provides that PLCAA does not apply to actions alleging knowing violations of "statute[s] applicable to the sale or marketing of" a firearm, ammunition, or firearm component "and [that] the violation was a proximate cause of the harm for which relief is sought," or (ii) PLCAA's exemption for negligence per se claims. *See* 15 U.S.C. § 7903(5)(A)(ii), (iii).

4. Whether the district court erred in dismissing Plaintiffs' claims against FAB Defense, Inc. ("FAB Defense"), FAB Manufacturing and Import of Industrial Equipment, Ltd. ("FAB Manufacturing"), and Torkmag based

3

on PLCAA, where those Defendants did not even invoke PLCAA as a ground for dismissal.

5. Whether the district court erred in dismissing Plaintiff Antonio Harris's case against FAB Manufacturing, where FAB Manufacturing did not move to dismiss Mr. Harris's claims.

## STATEMENT OF THE CASE

On April 22, 2022, Plaintiffs Karen Lowy and Antonio Harris were shot and critically injured in a sniper-style attack at the Edmund Burke School in Northwest Washington, D.C., executed with an arsenal of weapons of war manufactured, marketed, and sold by Defendants (the "Shooting"). JA29, JA32–33, JA117.

### A.   Factual History

### 1.   Raymond Spencer Builds His Arsenal of Defendants' Products.

In the months leading up to the Shooting, 23-year-old Raymond Spencer (the "Shooter") traveled around Northern Virginia building his stockpile of weapons. He also had numerous weapons components and accessories shipped to his Virginia apartment. JA31–33.[2] Once amassed and assembled,

---

[2]   To facilitate efficient review of the record, Plaintiffs cite to the JA pages corresponding to Ms. Lowy's complaint for allegations in both complaints.

4

the Shooter transported his arsenal of choice—including weapons made by Defendants Daniel Defense; FOSTECH, Inc. ("FosTecH"); Hearing Protection, LLC ("Griffin Armament"); Loyal 9 Manufacturing, LLC ("SOLGW"); and Centurion Arms, LLC ("Centurion Arms"); along with an AR-15-style rifle and M-Lok system made by Defendant Bravo Company USA, Inc. ("BCM"); a buttstock made by Defendant FAB Defense[3]; a high-capacity drum magazine and grip from Defendant Magpul; magazines from Defendants Daniel Defense, Surefire, and Torkmag; and ammunition from Defendants Federal Cartridge Company ("Federal Premium Ammunition")[4] and Fiocchi of America, Inc. ("Fiocchi")[5]—to the D.C. apartment he rented overlooking the Burke School to carry out his planned attack.  JA32–33.

### 2.    The Shooting and Its Aftermath.

**Karen Lowy & N.T.**:  On the afternoon of April 22, 2022, Ms. Lowy was waiting in her car in the school pick-up line for her 13-year-old daughter, N.T. JA29.  Without warning, the Shooter opened fire from his apartment window on children leaving school and the parents waiting for them, firing at least 239

---

[3]    FAB Defense is a subsidiary of FAB Manufacturing.  *See* ECF 46; JA34.
[4]    Federal Premium Ammunition is a subsidiary of Vista Outdoor, Inc. (by way of three other wholly-owned subsidiaries).  *See* ECF 14, JA35.
[5]    Fiocchi of America, Inc. is a subsidiary of Fiocchi Munizioni, S.p.A.  *See* ECF 52; JA35–36.

rounds before dying by suicide.  JA29.  Several AR-15 rounds shredded through Ms. Lowy's car.  JA29.

N.T. heard gunshots from inside the school, where she was getting ready for her mom to pick her up.  JA29.  Her teacher started yelling at the students to flee to safety.  JA29.  N.T. froze but was eventually pulled up the stairs to the school science lab.  JA29.  She remained barricaded inside the school until late into the evening, when she was transported to a reunification center where she waited, hoping her mom would get off of a bus that had transported adult survivors of the Shooting.  JA29.  Ms. Lowy never did.  JA29.

Secret Service agents responding to the Shooting found a critically injured Ms. Lowy lying in the street.  JA82.  Her heart stopped as she was rushed to a local trauma center.  JA82.  She was resuscitated twice.  JA82.  Emergency room physicians cut Ms. Lowy's chest open in the trauma bay— performing an emergency thoracotomy due to her cardiac arrest from the gunshots.  JA82.  Ms. Lowy was then rushed to the operating room to control her hemorrhaging.  JA82.  Surgeons noted multiple metal fragments—bullet pieces from Fiocchi and/or Federal Premium Ammunition products—in Ms. Lowy's body.  JA82.

Ms. Lowy's husband, Daniel Jaffe, spent hours frantically searching for

information, calling law enforcement and local hospitals. JA82–83. He saw news coverage of the Shooting that included an image of a SWAT team member standing next to Ms. Lowy's car. JA82. After hours of silence and fearing the worst, Ms. Lowy's family learned that a woman matching Ms. Lowy's description had been admitted to Washington Hospital Center. JA83. The family rushed to the hospital, where Mr. Jaffe identified Ms. Lowy in the Intensive Care Unit. JA83.

In the weeks and months following her initial hospitalization, Ms. Lowy attended countless doctors' appointments and physical and occupational therapy sessions. JA83. To this day, Ms. Lowy continues to require ongoing medical care as a consequence of the Shooting. JA83. She has been diagnosed with an anoxic brain injury, post-traumatic stress disorder, and major depression. JA83. Like her mother, N.T. has suffered severe emotional distress as a result of the Shooting. JA84. N.T. struggled to return to school and ultimately switched schools because it was too difficult to relive the Shooting every day. JA84.

**Antonio Harris:** As he had done for years since retiring from his 26-year career as a D.C. police officer, Mr. Harris arrived at the school around 3 p.m. on April 22 for his shift as a security guard. JA117. Within minutes, the

7

Shooter opened fire from above. JA117. Mr. Harris quickly yelled for students to get back in the building. JA117. As he tried to take cover, he was shot in the abdomen. JA117. Eventually, as the Shooting subsided, he was rushed to a local hospital where he underwent a series of emergency procedures to stem his bleeding and save his life. JA117.

Mr. Harris's survival is nothing short of a miracle. He sustained immense blood loss, his jaw was shattered when he fell to the ground, and he lost his right kidney and a large portion of his liver. JA166. He spent a week in a medically induced coma and nearly two months in the hospital receiving intensive treatment. JA166–167. Only with heroic effort and determination did he re-learn how to walk, write, and eat. JA167. To this day, Mr. Harris continues to suffer effects of the Shooting on a daily basis and to require medical care.

### 3. Daniel Defense, FAB Manufacturing and FAB Defense, BCM, SOLGW, FosTecH, Griffin Armament, and Centurion Arms Design and Market Weapons of War to Civilians.

The assault rifles manufactured and promoted by Daniel Defense, FAB Manufacturing and FAB Defense, BCM, SOLGW, FosTecH, Griffin Armament, and Centurion Arms to consumers like the Shooter are designed to kill as many people as possible as quickly as possible. JA38. While those

rifles were first designed for the battlefield, Defendants now promote them to civilians who fantasize about war. JA38. For example, according to the Oversight and Reform Committee of the U.S. House of Representatives, although "[n]inety percent of [Daniel Defense]'s sales are direct to civilian consumers, [] the company's marketing emphasizes the tactical nature of its products." JA41.

Despite knowing that mass shootings have been repeatedly perpetrated by young men armed with assault rifles, Defendants specifically and intentionally market their weapons, weapon accessories, and ammunition in ways that target troubled young men attracted to violent combat, increasing the risk that these young men will use Defendants' deadly weapons, weapon accessories, and ammunition to perpetrate mass violence. JA41.

For example, Defendants regularly promote their weapons and accessories through advertisements featuring imagery of soldiers in the field of war and men in military fatigues and tactical gear with captions such as "Saturdays are for the boys" (Daniel Defense), "Heading out of the office like…" (Daniel Defense), and "Ready…for the weekend" (BCM). JA42–48. Fiocchi has similarly depicted use of its product from what appears to be the balcony of a home or office, rather than at a shooting range or in a game

9

hunting setting.   JA49.   In conjunction with this militaristic messaging, Defendants publish ads stoking fear—of the government and other civilians— to promote stockpiling of their products, which of course leads to greater sales. JA50–57.



*Daniel Defense Facebook Advertisement (March 13, 2021)*

10



*Daniel Defense Instagram Advertisement (May 6, 2021)*



*BCM Instagram Advertisement (September 14, 2018)*



*Fiocchi Instagram Advertisement (July 1, 2021)*



*Centurion Arms Instagram Advertisement (June 25, 2021)*

All of these advertisements encourage civilians, and particularly "boys" and young men like the Shooter—who joined the U.S. Coast Guard but was discharged before completing basic training, JA41—to reenact military-style exercises with weapons of war. Defendants' marketing strategies are

designed to exploit adolescents' and young adults' attraction to impulsive, thrill-seeking behavior and their insecurities about their futures. And they are eerily reminiscent of the historical practices of the tobacco and alcohol industries, other industries that have exploited young consumers' vulnerability by designing advertisements that promote thrill-seeking and self-esteem inflating conduct to hook them early and convert them into lifelong purchasers of their products. JA58–59. Defendants also make blatant appeals to youth and young adults by using graphic novel and video game-like imagery in their advertisements. JA58–68.

Daniel Defense, BCM, SOLGW, and others have even advertised their products on social media in ways that appeal to the thrill-seeking impulses of young men like the Shooter by implying the products can and should be used for urban combat and illegal activity. JA70–77. In an Instagram ad published just over a month before the Shooting, Daniel Defense promoted an image of a rifle with a scope on a rooftop, targeting a car on a public street. JA70–71. An Instagram user asked, in response to the post titled "Rooftop Ready": "Is this an assassins setup? And can I buy this?" JA70–71. Daniel Defense's official account's response was to suggest that "anyone" could use this "assassin's setup" and that it "is live on our site right now!" JA70–71.

13



*Daniel Defense Instagram Advertisement (March 2, 2022)*

And in another ad that bears a sinister resemblance to the Shooter's attack on

Ms. Lowy as she sat in her car in the school pick-up line, BCM touts one of its

rifles as a "120ish yard hole puncher" that will shoot through cars—something

that no law-abiding civilian would ever need to be able to do.  JA71–72.



*BCM Instagram Advertisement (July 30, 2019)*

14

In fact, the Shooter used Defendants' weapons just as they encouraged him to in their social media marketing—targeting Ms. Lowy's car with a scope, and riddling it with as many bullet holes as he could.  JA70.

Additionally, FosTecH repeatedly advertised its "echo" trigger modification, which is designed to allow a shooter to "make it rain" bullets by firing both when the trigger is pulled and when it is released.  JA73–74. FosTecH advertised this product to increase the number of bullets that a weapon can fire with a single pull of the trigger without warning consumers that this would likely make their weapon a machine gun. JA74.  And with even less regard for the law, SOLGW advertises the fully automatic setting on its weapons as the "no fucks" setting.  JA74–76; *see also* JA76–77.  The Shooter had ***three fully automatic rifles*** at his disposal on the day of the Shooting. JA76–77.

Though the Shooter owned numerous other weapons, Defendants' products were his weapons, accessories, and ammunition of choice to carry out his school shooting.  JA33.  The Shooter assembled Defendants' products to create customized weapons of war for use in the Shooting.  The Shooter's decision to self-identify online as "an AR-15 aficionado" and to post about the Shooting strongly suggests that he created his arsenal after searching online

15

for how-to instructions and instructional videos and matching those with the companies whose weapons and weapons accessories he purchased. JA80–81. Indeed, in 2022, it is improbable that a young man could have been aware of the array of products that he purchased and assembled from so many Defendants without having consumed the avalanche of suggestive social media and advertisements published by Defendants. JA81. Not surprisingly, Defendants' deceptive and unfair marketing increased the level of violence of the Burke Shooting by putting in the Shooter's hands deadly weapons, accessories, and ammunition that were designed for mass death and making it possible for him to fire more than 200 shots at children and their caregivers. JA81.

Defendants cannot claim ignorance of their deceptive marketing and related conduct. From January 2012 through July 2022, 70 percent of the 10 mass shootings with the highest counts of gunshot injuries and deaths were perpetrated by male shooters aged 18–26. JA77–78; *see also* JA78–80. Defendants have taken no steps to guard against the sale of their weapons and other tools of war to those who would foreseeably commit such violent acts and, in some cases, have even gone so far as to ridicule the idea that their advertising should not promote and encourage violence. JA40–41.

**B.    Procedural History**

Ms. Lowy and N.T. filed suit on October 1, 2023 and Mr. Harris filed suit

on November 5, 2023, both alleging that Defendants had violated Virginia's

False Advertising Statute and Consumer Protection Act, and that certain

Defendants had committed negligence and/or negligence per se by violating

the National Firearms Act and Virginia Uniform Machine Gun Act.[6] The U.S.-

based Defendants moved to dismiss the Lowy complaint on varying grounds.[7]

Plaintiffs moved for leave to file an omnibus opposition to the Defendants'

motions to dismiss, which the district court denied in favor of Defendant-by-

Defendant briefing.[8] *See* JA16.

The district court scheduled argument on Defendants' motions to

---

[6]    Plaintiffs allege that Daniel Defense, Magpul, FAB Manufacturing, Fiocchi Munizioni, Surefire, and Torkmag committed negligence.    JA112–114. Plaintiffs allege that Daniel Defense, BCM, FosTecH, Griffin Armament, Centurion Arms, and SOLGW committed negligence per se.    JA110–111.

[7]    Given the additional time international service takes and, in the case of FAB Manufacturing, Defendant's default, FAB Manufacturing filed a motion to dismiss the Lowy complaint in February 2024 and Fiocchi Munizioni filed a motion to dismiss the Harris complaint in April 2024. *See* JA20, JA22.

[8]    The district court consolidated the Lowy and Harris cases on December 19, 2023.    JA18.    On January 11, 2024, the district court granted the joint motion of Plaintiffs and all Defendants except FAB Manufacturing and Fiocchi Munizioni for the motion to dismiss briefing filed in the Lowy case to apply to the Harris case as well.    JA272–273.

dismiss but cancelled that argument two days prior. Without engaging further with the parties, the court dismissed all of Plaintiffs' claims against all Defendants, concluding that Plaintiffs lacked Article III standing and that PLCAA posed an absolute bar because Plaintiffs had not established that Defendants' wrongful conduct proximately caused their injuries. It did not address Plaintiffs' request for leave to amend their complaints if the court was inclined to grant Defendants' motions. *See* JA327–337.

## SUMMARY OF ARGUMENT

I. Victims of a mass Shooting have Article III standing to sue the companies whose deceptive and dangerous marketing practices helped cause that Shooting. Plaintiffs extensively alleged that Defendants marketed and sold their assault weapons and other products in ways that promote unlawful and dangerous uses of these lethal products, *see, e.g.*, JA40–42, JA48–50, JA68–72; that Defendants knew their marketing could lead to mass shootings, JA30–31, JA68, JA77–80; that Defendants' deceptive marketing specifically targets young men like the Shooter, who are prone to violent, impulsive behavior, JA80; that the Shooter, a self-identified "AR-15 aficionado," was exposed to and influenced by Defendants' unlawful marketing while planning the Shooting, JA78, JA80–81; and that specific advertisements Defendants

18

promoted before the Shooting strikingly resemble elements of the sniper-style mass shooting at the Burke School, *see*, *e.g.*, JA49, JA70–71. At the pleading stage, those allegations were sufficient to meet Article III's low bar of pleading that Plaintiffs' injuries are "fairly traceable to" Defendants' "challenged conduct." *DiCocco* v. *Garland*, 52 F.4th 588, 591 (4th Cir. 2022) (citing *Lujan* v. *Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). The district court's dismissal order imposed an improperly strenuous pleading standard inconsistent with binding precedent holding that Article III causation is established when third-party conduct—even criminal conduct—that injures plaintiffs is the "predictable effect" of the defendants' challenged conduct. *See Dep't of Com.* v. *New York*, 588 U.S. 752, 768 (2019).

II. Plaintiffs also adequately alleged that PLCAA did not preclude their claims. PLCAA cannot offer any protection to Defendants who sold the Shooter the magazines that he used to fire over 200 rounds—Daniel Defense, Magpul, Surefire, and Torkmag—because those Defendants are not "manufacturer[s] or seller[s] of a qualified product" under PLCAA. 15 U.S.C. §§ 7903(4), (5)(A). And even where PLCAA may apply, Plaintiffs' actions are not prevented, per PLCAA's predicate and negligence per se exemptions, because Plaintiffs adequately alleged that their injuries were a reasonably

19

foreseeable consequence of Defendants' marketing practices, rendering PLCAA's limitations on certain actions against gunmakers inapplicable. The district court erred in concluding that Plaintiffs could not establish proximate cause when such question is almost always left for a jury. *RGR, LLC* v. *Settle*, 764 S.E.2d 8, 27 (Va. 2014).

The district court's blanket dismissal was also the product of other errors requiring reversal. The district court erred by dismissing: (i) Plaintiffs' claims against certain Defendants under PLCAA when those Defendants did not invoke PLCAA as a ground for dismissal and (ii) Plaintiff Harris's case against FAB Manufacturing when FAB Manufacturing did not even move to dismiss Mr. Harris's claims.

For the reasons set forth below, this Court should reverse the district court's dismissal of Plaintiffs' complaints or, in the alternative, vacate the dismissal and grant Plaintiffs leave to amend.

## STANDARD OF REVIEW

This Court reviews a district court's decision to grant a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) *de novo*. *See*, *e.g.*, *Williams* v. *Kincaid*, 45 F.4th 759, 765 (4th Cir. 2022). "A complaint need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it

20

rests.'" *Tobey* v. *Jones*, 706 F.3d 379, 387 (4th Cir. 2013) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quotation and citation omitted); *Williams*, 45 F.4th at 765. Plaintiffs are not required "to prove [their] case in the complaint." *Robertson* v. *Sea Pines Real Est. Cos., Inc.*, 679 F.3d 278, 291 (4th Cir. 2012) ("[t]he requirement of nonconclusory factual detail at the pleading stage is tempered by the recognition that a plaintiff may only have so much information at [her] disposal at the outset"). "Rule 12(b)(6) 'does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations.'" *Colon Health Ctrs. of Am., LLC* v. *Hazel*, 733 F.3d 535, 545 (4th Cir. 2013) (alteration in original) (quoting *Neitzke* v. *Williams*, 490 U.S. 319, 327 (1989)). Indeed, it is "error" for a district court to give "a serious claim the back of its hand" because it does not believe the plaintiff's allegations. *Id.* Rather, "the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." *Mylan Lab'ys, Inc.* v. *Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).

This Court also reviews a district court's decision to grant a motion to dismiss for lack of standing under Federal Rule of Civil Procedure 12(b)(1) *de novo*. *White Tail Park, Inc*. v. *Stroube*, 413 F.3d 451, 459 (4th Cir. 2005). Where, as here, defendants make a facial challenge to the complaint and the district court does not consider evidence outside of the pleadings, plaintiffs are entitled to "the same procedural protection" as under a Rule 12(b)(6) motion and "the facts alleged in the complaint are taken as true." *Kerns* v. *United States*, 585 F.3d 187, 192 (4th Cir. 2009).

## ARGUMENT

## I.    Plaintiffs Have Article III Standing.

The district court erred by imposing too high a jurisdictional burden on Plaintiffs at the pleading stage to demonstrate a causal link between Defendants' marketing of their AR-15-style firearms, ammunition, and firearm accessories and Plaintiffs' injuries suffered in a Shooting perpetrated using those weapons. Standing "requires a plaintiff to first answer a basic question: What's it to you?" *FDA* v. *All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024) (internal quotations omitted). Here, Plaintiffs' complaints, much of which the district court ignored wholesale, painstakingly demonstrate how the

Shooting and Plaintiffs' injuries were, at least in part, a predictable effect of Defendants' unlawful and dangerous advertising practices.

Article III requires nothing more. Plaintiffs need only allege that they (1) suffered an "injury in fact" that is (2) "fairly traceable to the challenged conduct" of the Defendants and (3) redressable by a favorable ruling by the court. *DiCocco*, 52 F.4th at 591 (citing *Lujan*, 504 U.S. at 560). It is undisputed that prongs (1) and (3) are satisfied; Plaintiffs suffered a cognizable injury and seek monetary relief, which satisfies the redressability requirement. *See, e.g.*, *Uzuegbunam* v. *Preczewski*, 141 S. Ct. 792, 802 (2021). The only issue is whether Plaintiffs' injuries are "fairly traceable" to Defendants' actions. Here, Plaintiffs' allegations that Defendants' marketing practices had a predictable effect on the Shooter are sufficient to establish standing at the pleading stage. *See Dep't of Com.*, 588 U.S. at 768.

### A.    At This Early Stage, Article III Imposes Only a "Relatively Modest" Burden.

"At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice," to demonstrate standing, "for on a motion to dismiss [courts] presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (quotation omitted). So while a complaint must allege "nonconclusory factual

details," courts have "tempered" that requirement "by the recognition that a plaintiff may only have so much information at [his or her] disposal at the outset" of a litigation. *Robertson*, 679 F.3d at 291. Courts therefore analyze standing "differently depending on the stage of the litigation at which the challenge is brought and the substance of the defendant's arguments." *Overbey* v. *Mayor of Balt.*, 930 F.3d 215, 227 (4th Cir. 2019); *Wikimedia Found.* v. *Nat'l Sec. Agency*, 857 F.3d 193, 212 (4th Cir. 2017).

At the motion to dismiss stage, Article III's standing requirements are "relatively modest," *Bennett* v. *Spear*, 520 U.S. 154, 171 (1997), particularly regarding causation, *DiCocco*, 52 F.4th at 592. And because pleadings are written before discovery, courts permit pleading upon information and belief where a plaintiff "reasonably believes" the allegations but "may need discovery to gather and confirm its evidentiary basis." *Aarow Elec. Sols.* v. *Tricore Sys., LLC*, 693 F. Supp. 3d 525, 544 (D. Md. 2023) (quotation and citation omitted); *Vaughn* v. *Perea*, 2021 WL 5879176, at *2 (4th Cir. Dec. 13, 2021); *see also* Wright & Miller, Federal Practice & Procedure § 1224 (4th ed. 2024).

**B.    Defendants' Conduct Had a Predictable, and Even a Determinative or Coercive, Effect on the Shooter.**

Across hundreds of paragraphs of allegations, Plaintiffs pled that Defendants market assault weapons and other products in a manner that promotes the militaristic and unlawful use of those products, *see, e.g.*, JA41, JA48–49, JA68–72; that Defendants knew their advertisements contained content unsuitable for certain audiences and that such marketing could lead to mass shootings, JA30–31, JA68, JA77–80; that Defendants' deceptive marketing specifically targets young men like the Shooter, who are prone to violent, impulsive behavior, JA80; and that the Shooter, a self-identified "AR-15 aficionado," was exposed to and influenced by Defendants' unlawful marketing while planning the Shooting, JA78, JA80–81. Plaintiffs identified specific advertisements that Defendants published and promoted before the Shooting that bear a striking resemblance to the sniper-style shooting that shattered Plaintiffs' lives. *See, e.g.*, JA70–72, JA74–77; *see supra* p. 14. And Plaintiffs laid out a simple and familiar theory of standing: Defendants—who instruct their social media followers to adjust their settings to allow "upsetting or offensive" posts so they can view "all the great content being put out there by the industry," and publicly complain that social media platforms have removed Defendants' advertisements for "coordinating harm or promoting

25

crime"—cannot now claim surprise that their advertisements foreseeably led to criminal conduct. *See* JA68–70.

The district court nonetheless dismissed Plaintiffs' allegations as a "speculative" causal chain in which (1) "defendants marketed their weapons and weapons accessories to potential consumers in Virginia," then (2) the "Shooter injured plaintiffs by firing at an elementary school." JA330–332. The district court held that Plaintiffs lacked standing because they had not alleged that Defendants coerced Shooter into committing the Shooting. JA332. This disregards Plaintiffs' robust allegations and grievously overstates the causal connection required to plead that Plaintiffs' injuries were "fairly traceable" to the Defendants' conduct, as Article III requires. *DiCocco*, 52 F.4th at 592.

Article III "does not require the [Defendants'] challenged action to be the sole or even immediate cause of the injury." *Sierra Club* v. *U.S. Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018). Nor does Article III require that defendants' actions coerce a third party into injuring plaintiffs to establish standing. Such coercive conduct is one way in which defendants' actions can be "fairly traceable" to plaintiffs' injuries, but the district court erred in considering it to be the only way. Rather, if the Defendants' actions had a "predictable" *or* "determinative or coercive" effect on the Shooter, then

Plaintiffs have standing. *Dep't of Com.*, 588 U.S. at 768 (finding Article III standing where plaintiffs' theory relied on the "predictable effect" of defendants' actions on third parties); *Bennett*, 520 U.S. at 169 (Article III standing does not preclude "injury produced by determinative or coercive effect upon the action of someone else").

> **1.    Plaintiffs Have Plausibly Alleged That Defendants' Marketing Practices Had a Predictable Effect on the Shooter.**

Defendants' actions were "at least in part responsible for" causing Plaintiffs' injuries because the Shooter's actions were the "predictable effect" of Defendants' marketing practices. *Dep't of Com.*, 588 U.S. at 768; *see also Libertarian Party of Va.* v. *Judd*, 718 F.3d 308, 316 (4th Cir. 2013) (Article III causation satisfied "[i]f [defendant's conduct] is at least in part responsible for" causing plaintiffs' injury); *Ateres Bais Yaakov Acad. of Rockland* v. *Town of Clarkstown*, 88 F.4th 344, 352–53 (2d Cir. 2023) (plaintiff had standing where defendants' actions to frustrate plaintiff's acquisition of property predictably led to plaintiff's counterparty terminating contract).

The Supreme Court's decision in *Department of Commerce* is instructive. 588 U.S. at 768. That case arose out of the Trump Administration's decision to reinstate a citizenship question on the census. *Id.*

27

at 761.  A group of plaintiffs sued the Department of Commerce asserting injuries including diminishment of political representation and diversion of resources, all based on "their expectation that reinstating a citizenship question will depress the census response rate and lead to an inaccurate population count." *Id.* at 767.  The government, characterizing plaintiffs' theory of causation as "tenuous," argued that "any harm to respondents [was] not fairly traceable to the Secretary's decision because such harm depends on the independent action of third parties choosing to violate their legal duty to respond to the census." *Id.*  In other words, like Defendants here, the government argued that Article III causation was not satisfied because plaintiffs' theory depended on third parties choosing to act unlawfully.

Rejecting that argument, the Court found that the discrepancy in census responsiveness—which was the direct source of the plaintiffs' feared harm—was "likely attributable ***at least in part*** to noncitizens' reluctance to answer a citizenship question." *Id.* at 768 (emphasis added).  The Court therefore concluded that Article III's causation prong was met because the alleged harm to plaintiffs was a "predictable effect" of the defendant's decision to add the citizenship question to the census, even though the harm would ultimately be caused by the illegal acts of third parties. *Id.*; *see also Estados Unidos*

*Mexicanos* v. *Smith & Wesson Brands, Inc.*, 633 F. Supp. 3d 425, 439 (D. Mass. 2022) (Article III's traceability prong is met even when "[t]he causal relation between the harm alleged and defendants' conduct depends upon the decisions of multiple independent parties," including "the independent choices of [] individuals to engage in criminal behavior"), *rev'd in part on other grounds*, 91 F.4th 511 (1st Cir.), *cert. granted*, No. 23-1141, 2024 WL 4394115 (Oct. 4, 2024).

Plaintiffs here allege that Defendants' marketing practices at issue are "the beginning and pivotal links in a foreseeable and predictable chain of events resulting in many mass shootings in America each year." JA30. They allege that Defendants know "that mass shootings have been repeatedly perpetrated by young men armed with assault rifles" but nevertheless choose to "specifically and intentionally market their weapons, weapon accessories, and ammunition in ways that appeal to adolescent and post-adolescent males, including through social media and invocations of other brands geared toward children and young adults." JA40–41; *see also* JA77–78 (explaining that most of the mass shootings with the highest counts of injuries and deaths between 2012 and 2022 were perpetrated by young men, to whom Defendants target their marketing).

29

Moreover, Defendants expend significant resources to market their AR-15-style firearms and ammunition and accessories for those firearms (including high-capacity magazines to increase the destruction they can cause without reloading) to purchasers who have no lawful practical use for such weapons, which they surely would not do if their advertisements did not have some predictable effect on consumers. Several U.S. leaders have called for investigations into and legislation regarding the marketing practices of firearm industry companies, including specifically regarding the practices of Daniel Defense because "time and time again, these practices have had deadly consequences." *See, e.g.,* Letter from Sen. Richard Blumenthal et al. to The Honorable Lina M. Khan, Chair, Fed. Trade Comm'n (Sept. 12, 2022); *see also* Mem. re: Comm.'s Investigation into Gun Indus. Practices & Profits, 116 Cong. H. Comm. Oversight & Reform (2022). And the deleterious effects of Defendants' dangerous and unlawful marketing of AR-15-style weapons and the ammunition and accessories that go with them are well-known: "AR-15s are disproportionately used in mass shootings: one recent examination found that although AR-platform rifles constituted about 5% of the firearms in the United States, they were used in 25% of mass shootings" and in "every major terrorist attack" over the past decade. *Bianchi* v. *Brown*, 111 F.4th 438, 456–

30

58 (4th Cir. 2024) (en banc).  Simply put, the "AR-15 and other assault rifles are the preferred weapons for those bent on wreaking death and destruction upon innocent civilians." *Id.* at 456.  AR-15-style weapons did not obtain this status accidentally.  Defendants are well-aware of how their products are used—they drum up demand by stoking fear of the government and fellow citizens, and their sales increase following mass shootings. JA30, JA50.  The district court disregarded all of these facts, which are sufficient at this stage to show that the Shooter's conduct and Plaintiffs' resulting injuries were the "predictable effect" of Defendants' marketing. *Dep't of Com.,* 588 U.S. at 768.

> **2.    Plaintiffs Have Also Plausibly Pled That Defendants' Marketing Practices Had a Determinative or Coercive Effect on the Shooter.**

The district court was wrong as a matter of law to conclude that Plaintiffs were required to plead a "determinative or coercive effect" of Defendants' conduct to meet Article III's traceability prong; the Supreme Court has recognized multiple theories by which plaintiffs may plead Article III causation. *See supra* Section I.B.1.  But even if pleading a "determinative or coercive effect" of Defendants' conduct were required, Plaintiffs have done so here.  The "determinative or coercive effect" standard is satisfied where the defendant publishes information that leads a third party to conclude it should

31

proceed in a way that injures the plaintiff. *Lansdowne on the Potomac Homeowners Ass'n, Inc.* v. *OpenBand at Lansdowne, LLC*, 713 F.3d 187, 197 (4th Cir. 2013) (standard met where defendant's exclusivity agreement led third party to decide it did not have the "green light" to offer plaintiffs services).

Plaintiffs allege that the Shooter, a self-identified "AR-15 aficionado," was exposed to and influenced by Defendants' unlawful marketing while planning the Shooting (as evidenced by his attack mirroring the imagery of their ads and the fact that it is unlikely that the Shooter coincidentally chose products from companies responsible for disturbing and dangerous marketing practices). JA70–71, JA81. Nothing more is required to satisfy Article III at this stage, and the district court's conclusion that Plaintiffs lack standing because they did not specifically allege that "defendants' advertising coerced Shooter to attack the elementary school," JA332, both overstates Plaintiffs' burden at this stage and improperly imposes a "magic words" pleading requirement. *Lujan*, 504 U.S. at 561 (in evaluating standing "on a motion to dismiss courts presume that general allegations embrace those specific facts that are necessary to support the claim" (cleaned up)).

The district court's decision also rested on the erroneous premise that allegations made on information and belief are only proper where necessary evidence is exclusively in Defendants' control, and that "the complaint does not suggest defendants control such evidence of Shooter's reliance." JA331. For one thing, information supporting Plaintiffs' claims may well be in Defendants' possession, given that Defendants' control and/or have access to their own social media, online platforms, and mailing lists and therefore have greater insights than Plaintiffs into their interactions with the Shooter.

Equally important, the district court got the law wrong: allegations on information and belief are entirely proper so long as they are based, as here, "on sufficient factual material that makes the inference of culpability plausible."[9] *Ahern Rentals, Inc.* v. *EquipmentShare.com, Inc.*, 59 F.4th 948, 954 (8th Cir. 2023) (collecting cases). In fact, the authority the district court cited recognizes as much. *See Ridenour* v. *Multi-Color Corp.*, 147 F. Supp. 3d 452, 456 (E.D. Va. 2015) (collecting cases regarding permissibility of

---

[9] This misapplication of law is especially harmful here, where Plaintiffs have diligently pursued information about the Shooting through FOIA requests, but, like many victims of gun violence, have faced claims (currently being litigated in parallel) that much of the information is currently exempted from disclosure because of an ongoing investigation. *See, e.g.*, *Lowy* v. *Fed. Bureau of Investigation*, No. 1:23-cv-00721 (D.D.C. 2023).

information and belief pleading, including when plaintiffs are relying "on second-hand information"). And though pleadings upon information and belief—like any pleadings—are not entitled to be credited if conclusory, the district court disregarded the numerous factual allegations that Plaintiffs pled as the basis for their belief that the Shooter was exposed to and affected by Defendants' marketing when planning and carrying out the Shooting, including that the Shooter specifically chose Defendants' products to execute the Shooting, JA33, that the Shooter self-identified online as an "AR-15 aficionado," JA80, and that the Shooter used Defendants' weapons in ways that closely mirrored their pre-Shooting marketing when he shot down at Plaintiffs, JA70–72. *Cf. Kashdan* v. *George Mason Univ.,* 70 F.4th 694, 702 (4th Cir. 2023).

The other cases cited by the district court do not support the result it reached. In *Simon* v. *Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26 (1976), for example, the Court held that plaintiffs lacked Article III standing to pursue speculative claims that an IRS revenue ruling had "encouraged" hospitals to deny services to indigent people by extending charitable tax benefits to hospitals regardless of whether they treated indigent patients. *Id.* at 42. Because there were no further allegations as to *how* the

revenue ruling encouraged hospitals to deny treatment, the Court had no basis to attribute the decision not to treat indigent patients to the revenue ruling or to determine whether non-defendant hospitals would stop denying services if the revenue ruling was found unlawful. *Id.* at 42–43.

Similarly, in *Alvarez* v. *Becerra*, 2023 WL 2908819 (4th Cir. Apr. 12, 2023), this Court held that the plaintiff lacked standing to pursue claims against the Department of Health and Human Services on the theory that the Department's (subsequently granted) motions to dismiss in an administrative proceeding deprived the plaintiff from obtaining a review of his appeal. *Id.* at *2. The *Alvarez* panel made the reasonable conclusion that it "simply [could not] find that a party presenting a reasonable legal argument in an adversarial proceeding can have a 'determinative or coercive effect' upon the independent, neutral arbiter before whom it appears and prevails." *Id.* at *4.

A fundamental difference exists between those cases and this case: in those cases, plaintiffs made unsupported, wholly speculative allegations that the actions of a government body caused third parties to lawfully respond in a manner that harmed the plaintiffs; whereas here, Plaintiffs allege that non-government Defendants acted in a way that they *knew* could predictably

encourage unlawful third-party violence. These allegations suffice to establish standing.

Plaintiffs' case is not the first to allege that gun industry defendants' conduct had a predictable or coercive effect on a shooter's behavior. Other federal courts across the country have considered the merits of claims[10] against gun industry defendants in circumstances where the final link in the chain of causation was the misuse of the firearm or firearm-related product by a third party. *See, e.g., Prescott* v. *Slide Fire Sols., LP,* 410 F. Supp. 3d 1123 (D. Nev. 2019) (denying motion to dismiss negligence claims premised on misleading marketing by manufacturer of bump stocks used in mass shooting without addressing standing); *Brady* v. *Walmart, Inc.*, 2022 WL 2987078 (D. Md. July 28, 2022) (denying defendant's motion for judgment on the pleadings for claims alleging negligent sale of firearm to man experiencing a mental health crisis, who subsequently committed suicide, without addressing standing); *Corporan* v. *Wal-Mart Stores E., LP*, 2016 WL 3881341 (D. Kan. July 18, 2016) (granting in part and denying in part defendant's motion to dismiss complaint alleging harm caused by defendant's sale of firearm to straw

---

[10] "It is axiomatic that standing is a threshold jurisdictional issue that must be determined before a court can consider the merits of a case." *Indus. Servs. Grp., Inc.* v. *Dobson*, 68 F.4th 155, 167 (4th Cir. 2023).

purchaser without addressing standing). If the district court's standing analysis were correct, none of those cases were justiciable.

That Defendants' conduct was not the "last step in the chain of causation" does not change the result. *Bennett*, 520 U.S. at 168–69. In *Bennett*, for example, local irrigation districts alleged that their use of water would be "irreparably damaged" by restrictions imposed by the Bureau of Reclamation after it received a biological opinion from defendant Fish and Wildlife Service. *Id.* at 157–60. The Supreme Court refuted the Service's contention that plaintiffs' injury was not "fairly traceable" to its opinion because the Bureau ultimately decided whether to enact a restriction. *Id.* at 168–69 (explaining that this argument "wrongly equate[d] injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation"). The Court emphasized that because "[t]he Service itself is, to put it mildly, keenly aware" of the effect of its opinions, plaintiffs sufficiently alleged the Service's actions had a "determinative or coercive effect" upon the Bureau. *Id.* at 169–71. This is the theory of standing Plaintiffs allege here.

## II.    The Protection of Lawful Commerce in Arms Act ("PLCAA") Does Not Bar Plaintiffs' Actions.

The district court also erred by holding that PLCAA bars Plaintiffs' actions expressly seeking to hold Defendants accountable for their own *unlawful* conduct that caused Plaintiffs' injuries. PLCAA was enacted in response to lawsuits seeking to hold firearm manufacturers and sellers liable for harms resulting from the "criminal or unlawful misuse" of certain products. 15 U.S.C. § 7901(b)(1). PLCAA does not automatically immunize any defendant who has anything to do with the gun industry. It is only concerned with actions "against a manufacturer or seller of a qualified product, or a trade association." § 7903(5)(A). And PLCAA should not be construed to displace state law claims where Congress has not expressed a clear intent to do so. *See Soto* v. *Bushmaster Firearms Int'l, LLC*, 202 A.3d 262, 312 (Conn.), *cert. denied, Remington Arms Co., LLC* v. *Soto*, 140 S. Ct. 513 (2019).

Even when PLCAA applies, the statute's purpose "is not to shield firearms sellers from liability for wrongful or illegal conduct." *Id.* at 317. Instead, PLCAA expressly allows actions to proceed where, as here, the basis for liability is the defendant's own conduct. PLCAA permits actions involving claims that a firearms or ammunition manufacturer or seller "knowingly violated a State or Federal statute applicable to the sale or marketing of the

38

[relevant] product," 15 U.S.C. § 7903(5)(A)(iii), and actions "brought against a seller for negligent entrustment or negligence per se," § 7903(5)(A)(ii).

Defendants seek to evade Plaintiffs' claims on the basis of PLCAA, but that statute does not even apply to all of them, and even where it could, Plaintiffs' claims fall outside its scope.

### A. PLCAA Does Not Apply to Daniel Defense, Magpul, Surefire, or Torkmag, Who Supplied the Shooter With the Rifle Magazines He Used to Execute His Attack.

PLCAA does not shield Daniel Defense, Magpul, Surefire, or Torkmag because those Defendants' rifle magazines that the Shooter used to execute his attack, JA32–33, are not a "qualified product" under PLCAA, *i.e.*, a "firearm," "ammunition," or "a component part of a firearm or ammunition." 15 U.S.C. § 7903(4), (5)(A). Rather—as Torkmag implied by failing to even raise PLCAA as a defense—they are firearm accessories, which are not covered by the Act. And even if magazines were a "qualified product" (which they are not), Magpul, Surefire, and Torkmag are not "manufacturer[s] or seller[s] of a qualified product." § 7903(5)(A). These four Defendants who supplied the Shooter's magazines thus cannot invoke PLCAA in the first place, regardless of the causal relationship between their conduct and Plaintiffs' injuries.

39

**1.    Rifle Magazines Are Not Component Parts, Because They Are Not Essential to a Firearm.**

Because PLCAA does not define the term "component part," this Court looks to dictionary definitions to determine its meaning. *See, e.g.*, *United States* v. *Lanning*, 723 F.3d 476, 481 (4th Cir. 2013). The ordinary meaning of "component" is "constituent," which is defined as "an essential part." *See Component*, Merriam-Webster, https://www.merriam-webster.com/dictionary/component (last visited Oct. 26, 2024); *Constituent*, Merriam-Webster, https://www.merriam-webster.com/dictionary/constituent (last visited Oct. 26, 2024). The word "component" can also refer to an "element," which is "a fundamental, essential, or irreducible constituent of a composite entity." *See Component*, Am. Heritage Dictionary, https://www.ahdictionary.com/word/search.html?q=component (last visited Oct. 26, 2024); *Element*, Am. Heritage Dictionary, https://www.ahdictionary.com/word/search.html?q=element (last visited Oct. 26, 2024). The plain meaning of "component part of a firearm," then, is a part of the firearm that is "essential."

PLCAA's statutory structure confirms this understanding. Although the statute leaves "component part" undefined, it *does* explicitly define "firearm," by cross-referencing another definition of that word in the Code.

40

*See* 15 U.S.C. § 7903(4) (citing 18 U.S.C. § 921(a)(3)). The cross-referenced section defines "firearm" to include not just what are commonly understood to be firearms but also "any firearm muffler or firearm silencer." 18 U.S.C. § 921(a)(3)(C). PLCAA, however, explicitly excludes firearm mufflers and silencers from *its* definition of "firearm." *See* 15 U.S.C. § 7903(4) (defining "qualified product" to include "a firearm (as defined in subparagraph (A) or (B) of section 921(a)(3)"). Congress thus plainly intended that *inessential* products, like mufflers and silencers, would *not* be encompassed within the definition of "qualified product."

Indeed, courts that have faced this issue have agreed with this understanding of the term "component part." For example, in a case relied on by the district court, the United States District Court for the District of Nevada concluded that whether a rifle stock is a "component part" of a rifle for purposes of PLCAA depends on whether that part is essential to the rifle:

> [T]he word "component" is defined as a "constituent part," and "constituent" means "an essential part," or "serving to form, compose, or make up a unit or whole." Merrian-Webster's Collegiate Dictionary 255, 267 (11th ed. 2003). "Part" means "one of the often indefinite or unequal subdivisions into which something is or is regarded as divided and which together constitute the whole," or "an essential portion or integral element."

41

*Prescott* v. *Slide Fire Solutions, LP,* 341 F. Supp. 3d 1175, 1188 (D. Nev. 2018) (citation omitted); *accord Jones* v. *Mean, LLC*, No. 810316/2023, slip op. at 3-4 (N.Y. Sup. Ct. Feb. 22, 2024), available at https://iapps.courts.state.ny.us/nyscef/ViewDocument?docIndex=F65eW6k NyQprKMPx3QcISQ==. The court contrasted a "component part" with an "accessory," noting that the latter is "a thing of secondary or subordinate importance," or "an object or device that is not essential in itself but adding to the beauty, convenience, or effectiveness of something else." *Prescott*, 341 F. Supp. 3d at 1188. In *Prescott*, the product at issue was an aftermarket rifle stock; the court first determined that a rifle stock is "essential" and "integral" to the operation of the rifle because it is the part by which a rifle is held when fired from the shoulder. *Id.* at 1188–89. It next went on to find that, therefore, any replacement stock is also a "component part." *Id.* at 1189.

Here, however, the issue is whether a rifle magazine is a component part of a firearm—that is, whether a magazine is essential to the operation of the rifle. On this issue, the district court jumped straight to *Prescott*'s second step: it assumed that the Shooter used Magpul's and Surefire's aftermarket

magazines[11] to replace the magazines sold with his rifles and then concluded that an aftermarket replacement magazine is a "component part" like the firearm's original magazine. JA333.[12]

But even if that is right, it skips past the antecedent question of whether rifle magazines are essential to a rifle to be considered a "component part" in the first place. They are not. Simply put, magazines are not necessary to the function of an AR-15-style rifle.[13] That is, a rifle magazine is not needed to load, fire, or discharge a bullet.[14] *See Green* v. *Kyung Chang Indus. USA Inc.*, 2022 WL 987555 (Nev. Dist. Ct. Mar. 23, 2022) (denying magazine manufacturer's motion to dismiss under PLCAA because magazines are not

---

[11] The district court did not address Plaintiffs' claims regarding Daniel Defense's and Torkmag's magazines. *See* JA333.

[12] The district court analyzed Magpul's grip in the same manner. JA333. Like Defendants' magazines, the Magpul grip at issue here was not a component part. *See* JA32–33. Magpul attempted to argue otherwise by improperly introducing a decades-old AR-15 guide that is far outside the four corners of Plaintiffs' complaints.

[13] The fact that these products are sold separately and are marketed by some of the Defendants as firearms "accessories" emphasizes the non-essential nature of rifle magazines. *See, e.g.*, Magpul, https://magpul.com/firearm-accessories/pmags/ar15-m4-m16.html; Daniel Defense, https://danieldefense.com/ar15/accessories/magazines.html.

[14] PLCAA's definition of "firearm" hinges on the weapon's ability "to expel a projectile," 18 U.S.C. § 921(a)(3), *i.e.*, to fire a shot. *See* 15 U.S.C. § 7903(4). Accordingly, for a component part to be "essential" to a "firearm," it must be essential to the function of firing a shot.

component parts of firearms), *mandamus denied, Kyung Chang Indus. USA Inc.* v. *Eighth Jud. Dist. Ct.*, 525 P.3d 836 (Nev.), *cert. denied*, 144 S. Ct. 98 (2023). While a magazine may add to the convenience or effectiveness of a rifle, those attributes render it merely an accessory—not an essential component part.

In ruling that rifle magazines are not component parts of firearms for purposes of PLCAA, the *Green* court agreed with *Prescott* that a rifle stock is essential to the operation of a rifle. *Green*, 2022 WL 987555, at *1. But the *Green* court found that rifle magazines are different: they are not essential, but merely convenient for loading ammunition and firing repeatedly without reloading. *Id.*

The *Green* decision is correct. Shooters of AR-15-style rifles, like the one used to execute the attack, often use magazines to aid in rapid re-chambering of ammunition. Nonetheless, those rifles can be manually loaded without a magazine. The magazine is therefore not essential to the function of the rifle. *See id.* (defendant magazine manufacturer conceded that magazine was not necessary to load and fire rifle).

This is not simply theoretical. There are at least three common situations in which a shooter will use a rifle without a magazine: 1) when

hunting in a state that requires "single shot" rifles for specific game hunting; 2) when benchrest shooting; and 3) if the magazine breaks, malfunctions, or is lost.

First, start with single-shot hunting. In Illinois, for example, deer hunters using rifles may only use single-shot rifles, which are defined as rifles that do not have a magazine in close proximity. 520 Ill. Comp. Stat. 5/2.25, 5/1.2bb. Deer hunters in Illinois (as well as similarly regulated hunters elsewhere) thus regularly use semi-automatic rifles without a magazine, demonstrating that a magazine is not essential to the operation of the rifle. The second situation is one the judge in *Green* noted during oral argument of the motion to dismiss:

> I may be the type of person that wants to fire one single bullet, check how it fired. Go downrange, check it out, bring back. Fire one single bullet and do it on and on again and, for example, there, it allows me to use the gun exactly how the manufacturers set it to be used. I'm firing the gun. I don't need a magazine to do any of that.

*Green*, Mot. to Dismiss Hr'g. Tr., at 10:22-11:3 (Jan. 18, 2022).[15] Finally, the third situation is self-explanatory: if a rifleman breaks or loses his magazine, he can and will manually reload his rifle. Whether by choice or by necessity,

---

[15] This transcript is attached to Plaintiffs-Appellants' Motion for Leave to File Supplemental Material.

an AR-15-style rifle is perfectly capable of functioning without a magazine installed.

For all of these reasons, magazines are not essential "component parts" of rifles, and therefore are not "qualified products" under PLCAA.

In concluding otherwise, the district court flipped the Rule 12(b)(6) standard on its head. The district court was required to "accept as true all well-pleaded allegations"—including Plaintiffs' allegations that Defendants' magazines were not component parts, *see* JA32—and otherwise "view the complaint in a light most favorable to the plaintiff." *Mylan Lab'ys., Inc.*, 7 F.3d at 1134. As discussed above, it was more than plausible to allege that Defendants' magazines were not component parts. And given the "limited facts before" the district court, any lingering doubt regarding whether Defendants' magazines are in fact component parts "would be better addressed at the summary judgment stage when a more developed factual record could be presented to the Court." *Bryant-Bush* v. *Shawnee Gun Shop, Inc.*, 2011 WL 13177539, *4 (W.D. Mo. Mar. 29, 2011) (denying motion to dismiss and delaying consideration of whether PLCAA barred plaintiff's claims).

**2. Regardless of the Status of Magazines, Magpul, Surefire, and Torkmag Are Not PLCAA-Eligible Manufacturers or Sellers of a Qualified Product.**

Even if rifle magazines are "qualified products," PLCAA does not protect Magpul, Surefire, and Torkmag because none of these entities fall within PLCAA's definition of what it means to be a "manufacturer or seller of a qualified product." 15 U.S.C. § 7903(5)(A). PLCAA precisely defines the terms "manufacturer" and "seller." "The term 'manufacturer' means, with respect to a qualified product, a person who is engaged in the business of manufacturing the product in interstate or foreign commerce *and* who is licensed to engage in business as such a manufacturer under chapter 44 of title 18." § 7903(2) (emphasis added). Similarly, "seller" means an "importer" or "dealer" who is "engaged" and "licensed to engage in business as such an" importer or dealer, or a "person engaged in the business of selling ammunition." § 7903(6). Accordingly, other than ammunition sellers—which Magpul, Surefire, and Torkmag are not and have not claimed to be—PLCAA protection is available only to manufacturers, importers, and dealers who are both (i) "engaged in the business" of manufacturing, importing, or dealing in

47

the qualified product *and* (ii) "licensed to engage" in such business. § 7903(2), (6).

Magpul, Surefire, and Torkmag fail to meet both prongs of this test with respect to any qualified product. First, regardless of whether they are *licensed* to manufacture or sell firearms, they are not actually "engaged in the business" of manufacturing or selling firearms. Certainly nothing in the complaints suggest that they are, and they did not argue otherwise below. *See* JA225–229 (Magpul and Surefire arguing that magazines constitute "component parts" but failing to explain why they are "manufacturers" or "sellers" under PLCAA); JA198–199 (Torkmag failing to raise PLCAA altogether). Magpul, Surefire, and Torkmag are thus not "manufacturers" or "sellers" of firearms within the meaning of PLCAA. *See* 15 U.S.C. § 7903(2), (6).

Even if they were, it would have no bearing on the analysis in this case, which is premised on their liability for their manufacture of *magazines*. *See* JA32–33, JA35–36. As the Ninth Circuit has explained, a "logical reading" of PLCAA "requir[es] a nexus between the basis of the allegations and the nature of the defendant's business." *Ileto* v. *Glock, Inc.*, 565 F.3d 1126, 1146 (9th Cir. 2009). For example, a defendant who meets PLCAA's definition of "seller" of

48

ammunition is not entitled to protection in a lawsuit premised on that defendant's manufacture and sale of *firearms*. *See id.* at 1145–46. Similarly, even if Magpul and Surefire are licensed "manufacturers" of *firearms*, they can still be sued for the manufacture and sale of *magazines*. To Plaintiffs' knowledge, Torkmag does not have any federal firearms license and, therefore, lacks even the most tenuous claim to PLCAA protection.

Second, as to magazines, although Magpul, Surefire, and Torkmag are engaged in the business of manufacturing and selling magazines, none of them is licensed to engage in that business. Under PLCAA's plain language, then, they are thus not "manufacturers" or "sellers" of magazines either. *See* 15 U.S.C. § 7903(2), (6). Accordingly, even if this Court determines that magazines are component parts, Plaintiffs' claims against Magpul, Surefire, and Torkmag should proceed because these Defendants do not fit the statutory definition of "manufacturer or seller of a qualified product." § 7903(5)(A).

## B.   Plaintiffs' Claims Are Exempt From PLCAA.

To the extent that Defendants can even invoke PLCAA, this action can proceed because Plaintiffs have asserted claims that fall within PLCAA's exemptions. PLCAA's "predicate exemption" allows actions to proceed where,

49

as here, Plaintiffs claim that "a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought." 15 U.S.C. § 7903(5)(A)(iii). PLCAA additionally carves out actions for negligence per se. § 7903(5)(A)(ii).

As discussed in the sections that follow, each of Plaintiffs' claims falls under at least one PLCAA exception. This Court, however, need not engage in a claim-by-claim inquiry to determine whether PLCAA applies with respect to each Defendant. PLCAA's plain language is clear that its protections and exemptions apply by "action" or "case." § 7902(a), § 7903(5). The Supreme Court has "stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank* v. *Germain*, 503 U.S. 249, 253–54 (1992). Here, by using the word "action," consistent with the Federal Rules of Civil Procedure, Congress decided to attach PLCAA's protections and exemptions to entire suits against PLCAA-eligible defendants, rather than to individual claims. *See* Fed. R. Civ. P. 2.[16] Consistent with this statutory language, courts have

---

[16] Additionally, PLCAA specifies that "[n]othing in this chapter shall be construed to limit the right of a person under 17 years of age to recover

"declined to engage in [] claim-by-claim analysis" of the applicability of PLCAA exceptions where one exception applies. *See Minnesota* v. *Fleet Farm LLC*, 679 F. Supp. 3d 825, 840 (D. Minn. 2023) ("Only one claim needs to survive the preemption analysis for the entire suit to move forward because the PLCAA preempts 'qualified civil liability actions,' not claims.").[17] Therefore, although each of Plaintiffs' claims satisfies at least one PLCAA exception, this Court need not engage in a claim-by-claim inquiry.

### 1.  PLCAA's Predicate Exception Permits Plaintiffs' Action to Proceed.

Plaintiffs' claims squarely fall within the predicate exception—and therefore are not barred by PLCAA—because each pleads (i) a violation of "a State or Federal statute applicable to the sale or marketing" of firearms, firearm components, or ammunition (i.e., the Virginia Consumer Protection Act ("VCPA"), the Virginia False Advertising Statute ("VFAS"), the National Firearms Act ("NFA"), or the Uniform Machine Gun Act ("UMGA"));

---

damages authorized under Federal or State law *in a civil action that meets 1* of the [PLCAA exceptions]." 15 U.S.C. § 7903(5)(D) (emphasis added). This provision, which applies here because Plaintiff N.T. is under 17 years of age, further specifies that Plaintiffs' action needs to only satisfy one PLCAA exception.

[17]  *See also Corporan*, 2016 WL 3881341, at *4 n.4; *Williams* v. *Beemiller, Inc.*, 100 A.D.3d 143, 151 (N.Y. App. Div. 2012); *King* v. *Klocek*, 187 A.D.3d 1614, 1616 (N.Y. App. Div. 2020).

(ii) committed "knowingly"; and that (iii) "the violation was a proximate cause of the harm for which relief is sought." *See* 15 U.S.C. § 7903(5)(A)(iii). The district court assumed without deciding that Plaintiffs alleged a knowing violation of state or federal law applicable to the sale or marketing of firearms, firearm components, or ammunition but erroneously concluded that the alleged violation was not the proximate cause of the harm based on its prior (also erroneous) holding that Plaintiffs had not pled causation in the context of Article III standing. JA334–337. Plaintiffs adequately alleged all three elements of PLCAA's predicate exception.

### a. Plaintiffs' Claims Are All Predicated on Statutes Applicable to the Sale or Marketing of Firearms and Ammunition.

Plaintiffs have alleged that each Defendant has violated a predicate statute "applicable" to the sale or marketing of firearms and ammunition.[18] 15 U.S.C. § 7903(5)(A)(iii). PLCAA does not define 'applicable,' *see* § 7903, so we look "to the ordinary meaning of the term." *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69 (2011). The Supreme Court has explained that "[a]pplicable means 'capable of being applied: having relevance' or 'fit, suitable, or right to

---

[18] Plaintiffs allege that all Defendants violated the VCPA and VFAS and that Daniel Defense, BCM, FosTecH, Griffin Armament, Centurion Arms, and SOLGW violated the NFA and UMGA. JA110–111.

be applied: appropriate.'" *Id.* (citation omitted). Under this definition, PLCAA's predicate exception applies to any state or federal statute that is capable of being applied to or is relevant to the sale or marketing of firearms, firearm components, or ammunition. *See Smith & Wesson Corp.* v. *City of Gary*, 875 N.E.2d 422, 431 (Ind. Ct. App. 2007); *Soto*, 202 A.3d at 301; *Brady*, 2022 WL 2987078, at *7 ("[T]he relevant question is not . . . whether the predicate statute explicitly prohibits the sale of firearms, but whether it is capable of being applied to the sale of firearms."). "If Congress had intended to limit the scope of the predicate exception to violations of statutes that are *directly, expressly, or exclusively* applicable to firearms, . . . it easily could have used such language, as it has on other occasions." *Soto*, 202 A.3d at 317.

The VCPA, VFAS, NFA, and UMGA all qualify as predicate state or federal statutes applicable to the sale or marketing of qualified products. The VCPA regulates transactions (including sales) of "goods," which are defined broadly to encompass "all real, personal or mixed property, tangible or intangible," including weapons and ammunition. Va. Code Ann. § 59.1–198; § 59.1–200. Similarly, Defendants' weapons and ammunition easily fit within VFAS' expansive reach, which covers "anything offered" by Defendants "directly or indirectly, to the public for sale." Va. Code Ann. § 18.2–216(A).

53

The UMGA also regulates the sale of Defendants' firearms by requiring that "[e]very manufacturer or dealer [] keep a register of all machine guns manufactured or handled," including information about the sale of each such machine gun. Va. Code Ann. § 18.2–294; *see also* § 18.2–288. And the federal NFA imposes similar obligations for manufacturers to register each "firearm" that they make or transfer (including via sale). 26 U.S.C. § 5841(b), § 5845(j). PLCAA itself even lists the NFA as a federal law that regulates the "sale, and use of firearms and ammunition in the United States." 15 U.S.C. § 7901(a)(4). There can be no dispute that the UMGA and NFA are predicate statutes.

And courts have uniformly held that statutes like the VCPA and VFAS, which undisputably apply to marketing of the firearms and ammunition at issue, are predicate statutes. Courts in Connecticut, Nevada, and Texas have expressly found those states' equivalent deceptive marketing or unfair trade practice statutes to qualify as predicate statutes under PLCAA. *Soto*, 202 A.3d at 317; *Prescott*, 410 F. Supp.3d at 1138–39; *Doyle* v. *Combined Sys., Inc.*, 2023 WL 5945857, at *10 (N.D. Tex. Sept. 11, 2023).

And still other courts have explained that statutes that apply to, but do not exclusively or expressly regulate firearms and ammunition, like the VCPA and VFAS, are appropriately considered as predicate statutes. For example,

in *City of New York* v. *Beretta U.S.A. Corp.*, 524 F.3d 384 (2d Cir. 2008), the court "[did] not agree [with defendants] that the PLCAA requires that a predicate statute expressly refer to the firearms industry." *Id.* at 401. Rather, the court interpreted the exception to exclude the New York nuisance law at issue but include "statutes that do not expressly regulate firearms but that can clearly be said to implicate the purchase and sale of firearms." *Id.* at 404. Similarly, in *Ileto*, the Ninth Circuit expressly rejected as too narrow the gun industry defendants' argument that only statutes that apply exclusively to the gun industry qualify under the predicate exception. 565 F.3d at 1134.

Plaintiffs are not aware of any court (including the court below) concluding that any statute like the VCPA or VFAS does not qualify under the predicate exemption, and this Court should consistently hold that the VFAS, VCPA, UMGA, and NFA are predicate statutes.

> **b.    Plaintiffs Have Plausibly Alleged That Defendants Knowingly Violated the Relevant Statutes.**

Plaintiffs have also alleged that Defendants "knowingly violated" the predicate statutes by intentionally marketing their products in unlawful ways. 15 U.S.C. § 7903(5)(A)(iii). "[T]he term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense"; it "does not necessarily

have any reference to a culpable state of mind or to knowledge of the law." *Bryan* v. *United States*, 524 U.S. 184, 192–93 (1998). Generally, even a criminal defendant "need not have known of the Statute [at issue] itself . . . in order to possess the requisite intent to violate it." *United States* v. *Bursey*, 416 F.3d 301, 308 (4th Cir. 2005).

Plaintiffs have alleged that, *inter alia*, each Defendant knew it was advertising to Virginia residents, knew it was making representations of existing fact in those advertisements, and knew that it was misrepresenting facts in those advertisements. *See, e.g.*, JA88, JA100 (for FosTecH, Inc.). These allegations are supported by facts pled throughout nearly 400 paragraphs regarding Defendants' marketing practices and their awareness of their role in leading to mass shootings. *See, e.g.*, JA30–31, JA37–38. Plaintiffs therefore have adequately alleged that Defendants knowingly violated the predicate statutes.

### c.    *Plaintiffs Properly Pled Proximate Cause.*

Plaintiffs have also adequately pled that the Defendants' unlawful actions were the proximate cause of their injuries, and the district court erred by deciding the fact-intensive proximate cause inquiry against Plaintiffs at the pleadings stage. Under Virginia law, proximate cause exists when the

56

plaintiff's injury is the "natural and probable consequence" of the defendant's conduct, *i.e.*, when the injuries are reasonably foreseeable. *Maroulis* v. *Elliott*, 151 S.E. 2d 339, 344 (Va. 1966) ("Liability ensues when injury results from a risk or hazard which may be reasonably foreseen, although the precise injury may not be foreseen."). Where multiple actors are involved in causing a plaintiff's injury, a defendant who did not take the final step in the causal chain remains a proximate cause of the injury if its conduct even "in the slightest degree[] causes the injury." *Williams* v. *Le*, 662 S.E.2d 73, 77 (Va. 2008) (a proximate cause is an "act or omission which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces that event, and without which that event would not have occurred" (citation omitted)); *see also Rich* v. *Commonwealth*, 793 S.E.2d 798, 800–02 (Va. 2016) (emphasizing that defendant remains liable unless subsequent actor becomes the "sole cause" of the injury and that reasonable inferences may support a finding of proximate cause).

Plaintiffs plausibly alleged that the Shooting was "the foreseeable and entirely preventable result of a chain of events" initiated by Defendants. JA29–30; *see also* JA31. Plaintiffs pled facts explaining that the Shooter chose Defendants' particular products from his stockpile because he believed that

those products would help him cause the most carnage possible. JA32–33. Plaintiffs also alleged that Defendants' advertising from before the Shooting bears a striking resemblance to the attack that the Shooter carried out with their products. JA70–72, JA74–76.

Plaintiffs further alleged that Defendants' deceptive marketing specifically targets young men prone to violent, impulsive behavior and that the Shooter, a self-identified "AR-15 aficionado," was exposed to and influenced by Defendants' unlawful marketing while planning the Shooting. JA78, 80–81. Finally, Plaintiffs alleged that Defendants are fully aware of their role in facilitating mass shootings, but have taken no steps to change their wrongful conduct. JA30–31. Indeed, as the complaints point out, the same Daniel Defense rifle that the Shooter purchased and used was chosen by another violent young man to commit a school shooting in Uvalde, Texas, just a month after the Shooting here. JA32. This is unfortunately unsurprising, as the types of firearms that these Defendants market and sell are disproportionately used in mass shootings across the country. *Bianchi*, 111 F.4th at 456. These facts are sufficient to plead at this stage that a mass shooting was the foreseeable result of Defendants' actions and that, without Defendants' marketing, the Shooter would not have chosen to target Ms.

58

Lowy's car or convert his weapons to fire automatically (and with high-capacity magazines), thereby increasing the potential lethality and destructiveness of his attack.

A criminal act that is "reasonably foreseeable," as the Shooter's was, does not sever the chain of proximate causation. *Gallimore* v. *Commonwealth*, 436 S.E.2d 421, 426 (Va. 1993) (rejecting argument that defendant's negligent acts did not proximately cause death resulting from accidental gunshot during fight between victim and third party); *see also Russo* v. *United States*, 37 F. Supp. 2d 450, 452 (E.D. Va. 1999) (it is "a well-settled principle of Virginia tort law that there may be more than one proximate cause for an event").

This long-established principle of tort law is inherent in PLCAA's predicate exemption. Were it the case that the criminal misuse of firearms severed the chain of proximate causation, the predicate exemption could serve no purpose; PLCAA is designed to allow lawsuits against firearm manufacturers and sellers for their unlawful conduct in circumstances where a third-party criminal act was the last link in the causal chain that injured plaintiffs.

The district court acknowledged that courts have found proximate cause allegations sufficient where the plaintiff's injury is connected to a gun industry

defendant's conduct by third-party criminal conduct.  *See* JA336 (discussing *Estados Unidos Mexicanos*, 91 F.4th 511).   The district court evaluated Plaintiffs' allegations unfavorably against those in *Estados Unidos Mexicanos* because Plaintiffs are claiming direct harm from a single Shooting rather than indirect harm from lots of shootings.  JA336.  This conclusion is mistaken, as Mexico's theory of causation was *more attenuated* than Plaintiffs' given that the government does not suffer direct harm from gun violence.  In *Estados Unidos Mexicanos*, plaintiffs rely on multiple criminal acts in a chain to argue Smith & Wesson is liable for the harms suffered as a result of cartel members acquiring firearms that subsequently injure people and property. 633 F. Supp. 3d at 439.  The chain of causation alleged by Plaintiffs here is much simpler: Plaintiffs allege that Defendants advertise and market their products to purposefully appeal to a subset of violent young men (including the Shooter) who then seek to make those advertisements reality.

There is nothing novel about Plaintiffs' claims, and there is ample precedent supporting liability for foreseeably increasing the risk of third-party criminal misconduct, like Plaintiffs pursue here.  For instance, in *In re September 11 Litigation*, the U.S. District Court for the Southern District of New York held that plaintiffs had adequately pled that the negligence of the

60

World Trade Center's owners and operators was the proximate cause of the injuries they sustained on September 11, 2001, notwithstanding defendants' claims that the terrorist attacks were an unforeseeable intervening cause. 280 F. Supp. 2d 279, 302 (S.D.N.Y. 2003). The court held that discovery was required to adjudicate the "parties' divergent claims about foreseeability," as plaintiffs alleged that defendants knew of the possibility of terrorist attacks but did not provide adequate fireproofing and escape routes. *Id.* Plaintiffs here—victims of a type of tragedy that occurs weekly or even daily—should similarly proceed to discovery on their claims that Defendants' wrongful conduct foreseeably caused their injuries.

The district court faulted Plaintiffs for not alleging "defendants' advertisements intentionally caused Shooter's attack," JA336, but this misstates the standard. Defendants did not need to intend to cause a school shooting to be held liable for their intentional conduct that foreseeably increased the risk of such Shooting, which greatly harmed Plaintiffs. *See, e.g.*, *Hines* v. *Garrett*, 108 S.E. 690, 695 (Va. 1921) (upholding liability for railroad that negligently let young woman off at the wrong location at dusk before she was raped by third-party criminals); *Cain* v. *Vontz*, 703 F.2d 1279, 1282–83 (11th Cir. 1983) (landlord could be liable for wrongful death of tenant where

61

landlord was negligent in repairing a lock because "[i]f the intervening criminal act was foreseeable, the original negligent party could still be liable").

As another example, in *Braun* v. *Soldier of Fortune Magazine, Inc.*, sons of a murder victim brought a wrongful death action against a magazine publisher, alleging that defendants negligently published an advertisement for a "Gun for Hire" that created an unreasonable risk of violent criminal activity. 968 F.2d 1110, 1112 (11th Cir. 1992). The case proceeded to trial, and the jury awarded damages. *Id.* at 1113. On appeal, the Eleventh Circuit held that there was sufficient evidence to sustain the jury's determination that publication of the advertisement was the proximate cause of plaintiffs' injuries, holding that "a reasonable jury could conclude that the criminal act that harmed appellees was reasonably foreseeable and, accordingly, that the chain of causation was not broken." *Id.*; *see also In re Nat'l Prescription Opiate Litig.*, 452 F. Supp. 3d 745, 764 (N.D. Ohio 2020) (denying motion to dismiss claims premising liability on marketing and distributing opioid products in a manner that foreseeably increased risk of illegal diversion, resulting in addiction-related injuries).

As the district court correctly acknowledged, whether a defendant's actions are the proximate cause of an injury almost always presents a factual

question that must be resolved by a jury. JA337; *see RGR, LLC*, 764 S.E.2d at 27 (only "when reasonable people cannot differ" can a court decide proximate cause as a matter of law); *Semler* v. *Psychiatric Inst. of D.C.*, 538 F.2d 121, 126 (4th Cir. 1976). As discussed above, *supra* p. 30, even our country's elected leaders have expressed concern about the impacts of Defendants' conduct at issue. This is not the exceptional case where "reasonable persons may not differ." JA337. The district court erred by concluding at the motion to dismiss stage that Plaintiffs could not establish proximate cause.

> **2.    PLCAA's Negligence Per Se Exception Also Authorizes Plaintiffs' Action Against Daniel Defense, Bravo Company, FosTecH, Griffin Armament, Centurion Arms, and SOLGW.**

Plaintiffs' action is also authorized by PLCAA's exception that permits any "action brought against a seller for negligent entrustment or negligence per se." 15 U.S.C. § 7903(5)(A)(ii). *See Woods* v. *Steadman's Hardware, Inc.*, 2013 WL 709110, at *4 (D. Mont. Feb. 26, 2013) (PLCAA treats negligence per se as an "exceptional sort of claim that can go forward" without interference); *Chiapperini* v. *Gander Mountain Co., Inc.*, 13 N.Y.S.3d 777, 786 (N.Y. Sup. Ct. 2014) (at the pleading stage, negligence per se claims "are not preempted by the clear language of the statute"). The district court's rejection of

Plaintiffs' negligence per se claims rested entirely on its incorrect proximate cause conclusion. *See* JA337. For the reasons stated above, *supra* pp. 56–63, that conclusion was erroneous, and Plaintiffs adequately alleged proximate cause.

### C. The District Court Erred in Dismissing FAB Defense, FAB Manufacturing, and Torkmag on PLCAA Grounds When They Did Not Raise PLCAA, and in Dismissing Mr. Harris's Case Against FAB Manufacturing Absent a Proper Motion.

Likely recognizing that PLCAA only applies to certain manufacturers and sellers, FAB Defense, FAB Manufacturing, and Torkmag did not even invoke PLCAA as a basis for dismissal. JA256 (FAB Defense); JA276 (FAB Manufacturing; JA198–199 (Torkmag). Yet the district court dismissed Plaintiffs' claims against all Defendants on that basis. That was error. As a matter of process, the district court could not properly dismiss Plaintiffs' claims *sua sponte* on the basis of PLCAA without giving Plaintiffs an opportunity to amend their complaints or otherwise respond as to why PLCAA does not apply to these Defendants. *United Source One, Inc.* v. *Frank*, 2024 WL 1108824, at *1 (4th Cir. Mar. 14, 2024). And on the merits, the district

court was wrong that PLCAA bars Plaintiffs' claims. *See* JA333; *see supra* 56–63.

The district court additionally erred by disposing of Mr. Harris's case against FAB Manufacturing, which had not even properly moved for dismissal. In light of its second default, FAB Manufacturing attempted to claim that its motion to dismiss the Lowy complaint also applied to the Harris complaint, and moved the district court to amend its motion to actually apply to the Harris complaint. Mr. Harris opposed, arguing that (1) FAB Manufacturing's motion referred to the Lowy Plaintiffs without reference to Mr. Harris; and (2) FAB Manufacturing's U.S. subsidiary, represented by the same counsel, had requested that its response in the Lowy case apply to Mr. Harris—recognizing the need to move in both cases—without doing the same for FAB Manufacturing. JA314–317. The district court entered a blanket dismissal without considering this issue. This, too, was error.

## CONCLUSION

For the foregoing reasons, this Court should reverse or, in the alternative, vacate the dismissal and grant Plaintiffs leave to amend.

Dated: October 28, 2024

Respectfully Submitted,

*/s/ H. Christopher Boehning*
H. CHRISTOPHER BOEHNING
JACOBUS J. SCHUTTE
JENIFER N. HARTLEY
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
    *1285 Avenue of the Americas*
    *New York, NY 10019*
    *(212) 373-3700*
   *cboehning@paulweiss.com*

KATHRYN M. ALI
ELIZABETH C. LOCKWOOD
MEGHAN PALMER
ALI & LOCKWOOD LLP
    *501 H Street NE, Suite 200*
    *Washington, DC 20002*
    *(202) 651-2476*
    *katie.ali@alilockwood.com*

*Counsel for Appellants Karen*
*Lowy, individually and as parent*
*and next friend of N.T., and*
*Antonio Harris*

## STATEMENT REGARDING ORAL ARGUMENT

Appellants respectfully submit that, given the complexity and novelty of the issues presented, oral argument would be helpful to the disposition of this appeal. *See* 4th Cir. Local Rule 34(a).

## CERTIFICATE OF COMPLIANCE WITH TYPEFACE AND WORD COUNT LIMITATIONS

I, H. Christopher Boehning, counsel for Appellants and a member of the Bar of this Court, certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B), that the attached Brief of Appellants is proportionally spaced, has a typeface of 14 points or more, and contains 12,979 words.

Dated: October 28, 2024

*/s/ H. Christopher Boehning*

H. Christopher Boehning

68

**CERTIFICATE OF SERVICE**

I, H. Christopher Boehning, counsel for Appellants and a member of the Bar of this Court, certify that, on October 28, 2024, a copy of the foregoing Brief of Appellants was served on all parties or their counsel of record through the CM/ECF system.

Dated: October 28, 2024

*/s/ H. Christopher Boehning*

H. Christopher Boehning