No. 24-1822

# In the United States Court of Appeals for the Fourth Circuit

◆

KAREN LOWY, individually and as parent and next friend of N.T.;
ANTONIO HARRIS,

*Plaintiffs-Appellants*,

v.

DANIEL DEFENSE, LLC; FAB DEFENSE, INC.; FAB MANUFACTURING
& IMPORT OF INDUSTRIAL EQUIPMENT LTD.; BRAVO COMPANY USA,
INC.; LOYAL 9 MANUFACTURING, LLC; FOSTECH, INC.; HEARING
PROTECTION, LLC; CENTURION ARMS, LLC; MAGPUL INDUSTRIES
CORP.; FEDERAL CARTRIDGE COMPANY; VISTA OUTDOOR, INC.;
FIOCCHI OF AMERICA, INC.; FIOCCHI MUNIZIONI S.P.A.; SUREFIRE,
LLC; TORKMAG, INC.,

*Defendants-Appellees*,

and

STARLINE, INC.; JOHN DOES 1-20,

*Defendants.*

◆

On Appeal from the United States District Court
for the Eastern District of Virginia
No. 1:23-cv-01338-CMH-IDD

◆

**BRIEF OF THE NATIONAL RIFLE ASSOCIATION
OF AMERICA AS *AMICUS CURIAE* IN SUPPORT
OF DEFENDANTS-APPELLEES AND AFFIRMANCE**

◆

ERIN M. ERHARDT
  *Counsel of Record*
JOSEPH G.S. GREENLEE
NATIONAL RIFLE ASSOCIATION
OF AMERICA – INSTITUTE FOR
LEGISLATIVE ACTION
11250 Waples Mill Road
Fairfax, VA 22030
(703) 267-1161
eerhardt@nrahq.org

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1822__      Caption: __Karen Lowy v. Daniel Defense, LLC__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__National Rifle Association of America__
(name of party/amicus)

_____

who is _____Amicus Curiae_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2. Does party/amicus have any parent corporations?  ☐ YES ☑ NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
   If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Erin M. Erhardt                    Date: 1/14/2025

Counsel for: Amicus Curiae

Print to PDF for Filing

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ...........................................i

TABLE OF AUTHORITIES................................................................iv

STATEMENT OF *AMICUS CURIAE*....................................................1

CONSENT TO FILE ........................................................................1

SUMMARY OF ARGUMENT .............................................................2

ARGUMENT ...................................................................................4

    I.   Defendants' Social Media Posts Are Protected Speech Under the First Amendment...........................................................4

      A.  Defendants' Posts Are Not Commercial Speech. ........................6

        1.  Defendants' Social Media Posts Represent Non-Commercial Advocacy, Not Pure Commercial Speech. ...................................6

        2.  Content and Viewpoint Discrimination Targeting Defendants' Social Media Posts is Presumptively Unconstitutional..............8

      B.  Defendants' Posts Do Not Meet the Standard for Incitement..10

    II.  Military and Law Enforcement Themed Advertising Reflects an Understanding of the Right to Keep and Bear Arms That Has Existed Throughout American History. ......................................15

CONCLUSION .............................................................................21

CERTIFICATE OF COMPLIANCE.....................................................22

CERTIFICATE OF SERVICE.............................................................23

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Free Speech Coalition*,
535 U.S. 234 (2002) ................................................................. 13

*Bolger v. Youngs Drug Prods. Corp.*,
463 U.S. 60 (1983) .................................................................... 6

*Brandenburg v. Ohio*,
395 U.S. 444 (1969) ............................................................ 10, 12

*Brown v. Entertainment Merchants Ass'n*,
564 U.S. 786 (2011) ................................................................ 12

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*,
447 U.S. 557 (1980) .................................................................. 6

*Chaplinsky v. State of New Hampshire*,
315 U.S. 568 (1942) .................................................................. 5

*Counterman v. Colorado*,
600 U.S. 66 (2023) .................................................................. 11

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ................................................................ 15

*Gavett v. Alexander*,
477 F. Supp. 1035 (D.D.C. 1979) ........................................... 19

*Greater Balt. Ctr. For Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*,
721 F.3d 264 (4th Cir. 2013) .................................................... 7

*Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*,
700 F. App'x 251 (4th Cir. 2017) ........................................... 6, 7

*Hess v. Indiana*,
414 U.S. 105 (1973) ...................................................... 11, 12, 14

*James v. Meow Media, Inc.*,
  300 F.3d 683 (6th Cir. 2002) .......................................................... 12, 14

*Jr. Sports Mags. v. Bonta*,
  80 F.4th 1109 (9th Cir. 2023) ................................................................ 9

*Lorillard Tobacco Co v. Reilly*, 533 U.S. 525 (2001) ............................... 11

*Maryland Shall Issue, Inc. v. Anne Arundel Cnty. Maryland*,
  91 F.4th 238 (4th Cir. 2024) ................................................................. 6

*Matal v. Tam*,
  582 U.S. 218 (2017) .............................................................................. 10

*McCoy v. Stewart*,
  282 F.3d 626 (2002) .............................................................................. 14

*New York Times Co. v. Sullivan*,
  376 U.S. 254 (1964) ................................................................................ 4

*R.A.V. v. City of St. Paul*,
  505 U.S. 377 (1992) ............................................................................ 5, 8

*Reed v. Town of Gilbert, Ariz.*,
  576 U.S. 155 (2015) ................................................................................ 9

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*,
  487 U.S. 781 (1988) ................................................................................ 8

*Rosenberger v. Rector and Visitors of Univ. of Va.*,
  515 U.S. 819 (1995) ................................................................................ 9

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011) .............................................................................. 10

*South v. State of Maryland for use of Pottle*,
  59 U.S. 396 (1855) ................................................................................ 16

*Texas v. Johnson*,
  491 U.S. 397 (1989) ................................................................................ 4

*United States v. Stevens*,
 559 U.S. 460 (2010) ........................................................... 5, 10

*United States v. Miller*,
 307 U.S. 174 (1939) ............................................................... 15

*United States v. Miselis*,
 972 F.3d 518 (4th Cir. 2020) .......................................... 10, 13

## Constitutional Provisions

U.S. CONST. amend. I ...................................................... *passim*

U.S. CONST. amend. II ..................................................... *passim*

## Statutes

1 Stat. 271 (1792) .................................................................. 15

32 Stat. 775 (1903) ................................................................ 18

33 Stat. 986 (1905) ................................................................ 18

36 U.S.C. § 40701 ................................................................. 20

## Other Authorities

Arthur D. Little, Inc., *A Study of the Activities and Missions of the
 NBPRP, report to The Department of the Army* (Jan. 1966) .............. 19

BLACK'S LAW DICTIONARY (11th ed. 2019) .............................. 10

BLACK'S LAW DICTIONARY (12th ed. 2024) .............................. 13

Cottrol, Robert J. & Denning, Brannon P., TO TRUST THE PEOPLE
 WITH ARMS (2023) ...................................................... 16, 17

Harsanyi, David, FIRST FREEDOM: A RIDE THROUGH AMERICA'S
 ENDURING HISTORY WITH THE GUN (2018) ........................... 18

Kopel, David B. & Greenlee, Joseph G.S., *The Second Amendment Rights of Young Adults*, 43 S. ILL. U. L.J. (2019) ............................... 16

Kopel, David B., *The Posse Comitatus and the Office of Sheriff: Armed Citizens Summoned to the Aid of Law Enforcement*, 104 J. CRIM. L. & CRIMINOLOGY 761 (2014) ......................................... 20

Shields, Joseph W., FROM FLINTLOCK TO M1 (1954) ............................. 18

STATE PAPERS AND ADDRESSES OF GOVERNOR HERBERT R. O'CONOR, vol. 3 (1947) ........................................................................... 17

Stentiford, Barry M., THE AMERICAN HOME GUARD (2002) ................... 17

Sword, Wiley, THE HISTORIC HENRY RIFLE (2006) ................................. 18

## STATEMENT OF *AMICUS CURIAE*[1]

The National Rifle Association of America (NRA) is America's oldest civil rights organization and foremost defender of Second Amendment rights. It was founded in 1871 by Union generals who, based on their Civil War experiences, sought to promote firearms marksmanship and expertise amongst the citizenry. Today, the NRA is America's leading provider of firearms marksmanship and safety training for both civilians and law enforcement. The NRA has approximately four million members, and its programs reach millions more.

The NRA has an interest in this case because pro-Second Amendment advocacy is central to the NRA's mission and is protected by the First Amendment.

### CONSENT TO FILE

All parties consented to the filing of this brief.

---

[1] No counsel for a party authored this brief in any part. No party or counsel contributed money intended to fund its preparation or submission. No person other than *Amicus* and its members contributed money intended to fund its preparation or submission.

1

## SUMMARY OF ARGUMENT

This is a case about free speech dressed up as a case about firearms. Plaintiffs allege that Defendants caused their injuries because a third party ("the Shooter") *may* have seen Defendants' social media posts and consequently been inspired to commit horrific criminal violence.

Defendants—manufacturers of firearms and firearms parts—post pro-Second Amendment content on social media. These posts show weapons and individuals handling weapons; they often include military gear and tactical equipment. There is nothing illegal about Defendants' posts. In fact, Defendants' posts are nothing more or less than an exercise of free speech. Their pro-Second Amendment advocacy is protected by their First Amendment right to free speech.

Plaintiffs, however, disagree with Defendants' message and seek to censor them. At bottom, they claim that Defendants' posts fall into categories that would reduce or remove their First Amendment Protection. They claim that Defendants' posts are commercial speech, subject to less stringent scrutiny than non-commercial speech. But Defendants' posts do not propose a commercial transaction; rather, they advocate Defendants' pro-Second Amendment ideology. Such advocacy is

not commercial speech, even when spoken by a commercial entity. And regardless, Plaintiffs' attempt to censor Defendants' pro-Second Amendment stance is presumptively unconstitutional viewpoint discrimination, which is always subject to strict scrutiny, even for commercial speech.

Plaintiffs also claim that Defendants' posts incited the Shooter to violence. But incitement to violence is a high standard, and Defendants' posts do not reach it. Defendants' posts were not intended to produce violence, nor were they directed at a particular party. And courts have repeatedly held that media such as video games, movies, and other content are not sufficiently "likely" to incite violence. Moreover, Defendants' posts, which the Shooter may or may not have consumed over the course of years, do not have the temporal imminence to the Shooter's violent crime required of incitement.

Finally, the militaristic and tactical imagery of Defendants' posts, far from attempting to incite ordinary civilians to unlawful action, highlights the historical connection between the military and the right to keep and bear arms. There is nothing sinister or unlawful underlying the posts.

3

# ARGUMENT

## I. Defendants' Social Media Posts Are Protected Speech Under the First Amendment.

At its core, this is a case about free speech. Plaintiffs disagree with Defendants' message—pro-Second Amendment advocacy—so they claim Defendants have no right to express their opinion. But the First Amendment does not merely protect inoffensive speech. Rather, the "bedrock principle underlying the First Amendment … is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson,* 491 U.S. 397, 414 (1989).

The fact that Plaintiffs are private parties and not governmental entities is of no import. "Civil lawsuit[s] between private parties" cannot "appl[y] a state rule of law which … impose[s] invalid restrictions on their constitutional freedoms of speech." *New York Times Co. v. Sullivan*, 376 U.S. 254, 265 (1964). "The fear of damage awards under such a rule … may be markedly more inhibiting than the fear of prosecution under a criminal statute." *Id.* at 277. This is precisely Plaintiffs' goal: to apply state advertising laws to Plaintiffs' social media posts in order to seek a

4

damages award that would punish and prevent Plaintiffs' pro-Second Amendment speech.

The First Amendment states that "Congress shall make no law … abridging the freedom of speech." U.S. CONST. amend. I. "From 1791 to the present, however, our society … has permitted restrictions upon the content of speech in a few limited areas." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382–83 (1992). Thus, while the right to free speech is not absolute, its carveouts are both "narrowly limited" and "well-defined." *United States v. Stevens*, 559 U.S. 460, 468–69 (2010) (quoting *Chaplinsky v. State of New Hampshire*, 315 U.S. 568, 571–72 (1942)).

Defendants' social media posts are protected speech unless they fall into one of those narrow and well-defined exceptions. They do not. Plaintiffs attempt (through characterization if not by name) to shoehorn Defendants' posts into two categories that fall outside the full protection of the First Amendment: commercial speech and incitement. *See, e.g.*, Pl.'s Br. at 12 ("[T]he shooter here did exactly as Defendants encouraged in their marketing and advertising."). But Defendants' posts are neither commercial speech nor do they meet the standard for incitement.

5

### A.     Defendants' Posts Are Not Commercial Speech.

#### 1.     Defendants' Social Media Posts Represent Non-Commercial Advocacy, Not Pure Commercial Speech.

Defendants' social media posts do not meet the definition of pure commercial speech. Commercial speech is speech that is "specifically related to" or "proposes a commercial transaction." *Maryland Shall Issue, Inc. v. Anne Arundel Cnty. Maryland*, 91 F.4th 238, 248 (4th Cir. 2024), *cert. denied sub nom. MD Shall Issue, Inc. v. Anne Arundel Cnty.*, MD, No. 23-1225, 2024 WL 4426600 (U.S. Oct. 7, 2024) (cleaned up). More saliently, it is "expression related *solely* to the economic interests of the speaker and its audience." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 561 (1980) (emphasis added).

Three factors inform whether speech is commercial: "whether the message is economically motivated, promotes a specific product, and is an advertisement." *Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 700 F. App'x 251, 257 (4th Cir. 2017) (citing *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66–67 (1983)). Importantly, the "identity of the speaker does not categorically determine whether a speaker is economically motivated." *Id.* at 259. This Circuit also considers

6

whether the speech is "directed at the providing of services rather than toward an exchange of ideas." *Id.* at 258 (quoting *Greater Balt. Ctr. For Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 286 (4th Cir. 2013)).

Plaintiffs state that "Defendants regularly promote their weapons and accessories through advertisements featuring imagery of soldiers in the field of war and men in military fatigues and tactical gear" in order to "stok[e] fear—of the government and other civilians—to promote stockpiling of their products, which of course leads to greater sales." Pl.'s Br. at 20–21. But Defendants' posts are not merely commercial advertisements.

Defendants' social media posts do not relate solely to Defendants' economic interests. *See* Pl.'s Br. at 21–23. They do not propose a commercial transaction, provide pricing information, or even provide links to products. *Id.* Only one even references a specific product offered by a Defendant. *Id.* at 23. Rather than advertising specific wares, Defendants' posts promote an idea: the exercise of Second Amendment-protected rights. Thus, the posts Plaintiffs point to represent not commercial speech but non-commercial Second Amendment advocacy.

7

Moreover, even if there is some commercial value in Defendants'
posts, "speech [does not] retain[] its commercial character when it is
inextricably intertwined with otherwise fully protected speech." *Riley v.
Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 796 (1988).
And the promotion of constitutional rights—here, those protected by the
Second Amendment—is unquestionably fully protected speech,
inextricable from any ancillary commercial speech contained in
Defendants' posts.

> **2.    Content and Viewpoint Discrimination Targeting
> Defendants' Social Media Posts is Presumptively
> Unconstitutional.**

Plaintiffs' attempt to claim that Defendants' constitutional
advocacy is unprotected is nothing more than impermissible content and
viewpoint discrimination. Plaintiffs disagree with Defendants' pro-
Second Amendment ideology and the content of their posts supporting
that viewpoint. But restricting Defendants' speech—or holding them
liable for it—on those grounds is unconstitutional, even if Defendants'
speech were commercial.

"Content-based regulations are presumptively invalid." *R.A.V.*, 505
U.S. at 382. Content-based discrimination is that "targeted at specific

8

subject matter … even if it does not discriminate among viewpoints within that subject matter." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 169 (2015). Thus, restrictions that target Second Amendment discourse—whether for or against—are content based and presumptively invalid.

Viewpoint discrimination—"the regulation of speech based on 'the specific motivating ideology or the opinion or perspective of the speaker'—is a 'more blatant' and 'egregious form of content discrimination.'" *Id.* (quoting *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)). Yet this is exactly what Plaintiffs advocate for by seeking to hold Defendants liable based on their social media posts. Plaintiffs' position would "effectively remove[] one viewpoint from the public conversation over the proper role of firearms in our society, while leaving the opposite viewpoint free to participate." *Jr. Sports Mags. v. Bonta*, 80 F.4th 1109, 1123 (9th Cir. 2023) (Van Dyke, J., concurring). This is presumptively unconstitutional, regardless of whether Defendants' speech is commercial: "'Commercial speech is no exception' … to the principle that the First Amendment 'requires heightened scrutiny'" in the face of viewpoint discrimination. *Matal v.*

*Tam*, 582 U.S. 218, 251 (2017) (Kennedy, J., concurring) (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011)).

## B. Defendants' Posts Do Not Meet the Standard for Incitement.

Plaintiffs claim that Defendants' social media posts incited the Shooter to violence in a manner that renders Defendants' posts unprotected under the First Amendment. Plaintiffs do not use the term "incite" in their brief, opting instead for terms like "encourage" and "influence." Pl.'s Br. at 26 (alleging Defendants "encouraged" the Shooter through "their social media"); *id.* at 43 (the Shooter was "influenced" by Defendants' posts.). But it is clear that Plaintiffs claim, at bottom, that Defendants' protected speech incited the Shooter to use their products in an unlawful manner.

"'[I]ncitement' refers to '[t]he act of persuading'—that is, of inducing—'another person to commit a crime.'" *United States v. Miselis*, 972 F.3d 518, 532 (4th Cir. 2020) (quoting *Incitement*, BLACK'S LAW DICTIONARY (11th ed. 2019)). True incitement is one of the traditional categories of speech upon which "the First Amendment has permitted restrictions." *Stevens*, 559 U.S. at 468 (quotation omitted) (citing *Brandenburg v. Ohio*, 395 U.S. 444, 447–49 (1969) (*per curiam*)).

10

But the standard for incitement is high. "[T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg*, 395 at 447. Defendants' social media posts do not meet this standard—something Plaintiffs clearly recognize, as they refuse to categorize their claim as incitement.

Incitement includes an element of intent. When it comes to "incitement to unlawful conduct … the First Amendment precludes punishment, whether civil or criminal, unless the speaker's words were 'intended' (not just likely) to produce imminent disorder." *Counterman v. Colorado*, 600 U.S. 66, 77 (2023) (quoting *Hess v. Indiana*, 414 U.S. 105, 109 (1973)). Indeed, intent is crucial: "Every idea is an incitement, and if speech may be suppressed whenever it might inspire someone to act unlawfully, then there is no limit to the State's censorial power." *Lorillard Tobacco Co v. Reilly*, 533 U.S. 525, 580 (2001) (Thomas J., concurring) (quotations and citations omitted). Yet Plaintiffs have

11

provided no evidence that Defendants intended to produce violence through their posts.

Additionally, Defendants' posts were not "directed to any person or group of persons," let alone directed specifically towards the Shooter. *Hess*, 414 at 108–09; *see also* Df.'s Br. at 25 ("Plaintiffs did not identify which online retailers they believe the Shooter visited; nor did they allege than any particular Defendant made any particular post on any particular website the Shooter visited."). Thus "it cannot be said that [Defendants were] advocating, in the normal sense, any action." *Hess*, 414 at 108–09.

Moreover, Defendants' posts were not "likely" to cause violence as required by *Brandenburg*. Courts have repeatedly held that violent movies and even interactive video games in which the player himself engages in "astounding" violence are protected by the First Amendment. *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 798–99 (2011); *see also James v. Meow Media, Inc.*, 300 F.3d 683, 699 (6th Cir. 2002) (rejecting allegations that violent video games meet the foreseeability standard for incitement because "it is simply too far a leap from shooting characters on a video screen (an activity undertaken by millions) to

12

shooting people in a classroom"). If violent movies and video games—media marketed primarily to the same young men Plaintiffs claim Defendants target on social media, Pl.'s Br. at 20—are not "likely" to incite violence, neither are Defendants' social media posts of still images depicting individuals in military and tactical gear.

This is true even if, as Plaintiffs allege, Defendants' speech advocated the unlawful use of firearms. Again, "advocacy of lawlessness retains the guarantees of free speech unless it's directed and *likely* to produce imminent lawlessness." *Miselis*, 972 F.3d at 533 (emphasis added). "[T]he mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it." *Id.* at 536 (quoting *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 253 (2002)).

Finally, the Shooter's actions did not "imminently" follow Defendants' posts. Plaintiffs allege that the Shooter spent "months … building his stockpile of weapons." Pl.'s Br. at 15. They provide posts from Defendants spanning the course of years. *Id.* at 21–23. Yet imminent means immediate. See *Imminent*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("threatening to occur *immediately*") (emphasis added). At best, Plaintiffs allege that Defendants' posts—if seen by the Shooter at all—

13

*may* have influenced the Shooter to act at some later time. But "a state cannot constitutionally sanction 'advocacy of illegal action at some indefinite future time.'" *McCoy v. Stewart*, 282 F.3d 626, 631 (2002) (quoting *Hess*, 414 U.S. at 108). Indeed, "the theory of causation" that "persistent exposure to the defendants' media" eventually led the exposed party to commit violence "is far from the temporal imminence that we have required to satisfy the *Brandenburg* test." *James*, 300 F.3d at 698.

The standard for incitement to violence is exactingly high. Plaintiffs fail to demonstrate that Defendants' posts met any part of it.

Defendants' social media posts are protected by the First Amendment. They are a form of non-commercial political advocacy, not pure commercial speech. And Plaintiffs' attempt to censor Defendants' posts under the color of law constitutes discrimination based on the content and viewpoint thereof, which is presumptively unconstitutional even in the context of commercial speech. Moreover, Defendants' posts do not meet the standard for incitement to violence. Defendants' posts are fully protected by the First Amendment.

14

## II.   Military and Law Enforcement Themed Advertising Reflects an Understanding of the Right to Keep and Bear Arms That Has Existed Throughout American History.

Plaintiffs make much of the "militaristic messaging" of Defendants' social media posts. Pl.'s Br. at 21; *see also id.* at 23 (alleging that Defendants' posts "encourage civilians … to reenact military-style exercises with weapons of war"). But Plaintiffs' claims ignore the history of the right to keep and bear arms.

Throughout American history, the exercise of the right to keep and bear arms has always had a synergistic relationship with military use of arms. Indeed, the first clause of the Second Amendment declares the necessity of "a well regulated militia." U.S. CONST. amend. II.

Historically, militiamen had to provide their own arms, suitable for military use. *See District of Columbia v. Heller*, 554 U.S. 570, 624 (2008) ("Ordinarily when called for militia service able-bodied men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time.") (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)) (brackets omitted). The 1792 federal militia act specified the firearms and edged weapons that militiamen had to possess and bring to service. 1 Stat. 271 (1792). Colonial and early State arms

15

statutes ordered most of the free population (sometimes including females) to own particular types of firearms and bladed weapons. *See* David Kopel & Joseph Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. ILL. U. L.J. 495 (2019) (describing hundreds of pre-1800 statutes). These arms mandates were not enacted by legislatures insistent that everyone go duck-hunting. They were enacted so that the population would have combat weapons.

Additionally, ordinary citizens participated in law enforcement by being obliged to join in the "hue and cry" to pursue fleeing criminals, the "watch and ward" to guard towns during day ("ward") and night ("watch"), and the posse comitatus to assist the sheriff in keeping the peace. *Id.* at 534–35; *see also South v. State of Maryland for use of Pottle*, 59 U.S. 396, 402 (1855) (A sheriff "may command the posse comitatus or power of the country; and this summons, every one over the age of fifteen years is bound to obey, under pain of fine and imprisonment.").

During World War I, "while the Army, including the National Guard, was either overseas or in training camps, states formed home guard companies to guard bridges, power plants, and other potential targets for sabotage." Robert Cottrol & Brannon Denning, TO TRUST THE

16

PEOPLE WITH ARMS 69 (2023). The same decade, "Faced with incursions from revolutionaries and bandits caught up in the bloody Mexican Revolution of 1910–1920, sheriffs and their posses in the American Southwest occasionally joined soldiers from the US Army or acted alone to fight off invaders from south of the border." *Id.*

In World War II, "several states formed state guard units to guard critical installations and to be available for civil disturbances." *Id.* After Pearl Harbor, Hawaii relied heavily on volunteer civilians, and "created a more extensive militia system than any other state or territory." Barry Stentiford, THE AMERICAN HOME GUARD 149 (2002). The volunteers were responsible for "breach defense, watching strategic and vulnerable points such as hilltops, runways, and crossroads, traffic control, providing guides and scouts for the army, and, if all else failed, implementation of scorched earth in the path of invaders." *Id.*

Maryland's governor called forth volunteer citizens "to furnish immediately, local protection against parachute troops, saboteurs, or organized raiding parties." 3 STATE PAPERS AND ADDRESSES OF GOVERNOR HERBERT R. O'CONOR 618 (1947). The best arms that citizens could bring were arms suitable for defending the community against enemy invaders.

The old-fashioned .30-06 bolt-action rifle is beloved by generations of American hunters. Introduced in 1903 and improved in 1906, it was the standard military service rifle for decades. *See* Joseph Shields, FROM FLINTLOCK TO M1 153–60 (1954). Colt revolvers found their first financial success with military contracts. *See* David Harsanyi, FIRST FREEDOM: A RIDE THROUGH AMERICA'S ENDURING HISTORY WITH THE GUN 100–04 (2018). The 16-shot lever action Henry Rifle, still in production today, started in 1862 as an arm for Union soldiers in the Civil War. *See* Wiley Sword, THE HISTORIC HENRY RIFLE 25–31 (2006).

To encourage responsible Americans to learn the skills required if their country needed their armed service, Congress in 1903 created the Civilian Marksmanship Program and the National Board for the Promotion of Rifle Practice, whose purposes included organizing National Matches. Militia Act, 32 Stat. 775 (1903). Then Congress authorized the sale of surplus military firearms to the public. 33 Stat. 986 (1905). The NRA was the chosen distribution agent via its many affiliated clubs.

In 1916, Congress created the Office of the Director of Civilian Marksmanship to administer the civilian marksmanship program, commonly called "DCM." *See* Johnson, at 550–52.

18

The DCM program worked very well, according to a 1966 study by the Arthur D. Little consulting firm. Comparing soldiers who had differing gun club backgrounds and soldiers with none, the study found that Army trainees with prior gun club membership in general, and DCM club membership especially, "achieved significantly higher" Marksmanship Qualification Scores. Arthur D. Little, Inc., *A Study of the Activities and Missions of the NBPRP, report to The Department of the Army* 15 (Jan. 1966).[2] They were also most likely to "enlist," "prefer a combat outfit," and "become a marksmanship instructor." *Id.* at 16.

Further, said the Arthur D. Little study, the National Matches, which are shot by citizens bearing their personal arms, were studied by the military to assess best practices to teach shooting and marksmanship. The Army Marksmanship Training Unit adopted knowledge gleaned from the National Matches into its marksmanship instruction manuals. *Id.* at 49. The study did not find any instance of a DCM gun being used in a crime, or of a DCM member using a gun in a

---

[2] https://shared.nrapvf.org/sharedmedia/1511988/nbprp-study-little-1966-complete.pdf.

crime. *Id.* at 41.[3] Today, citizens who choose to serve in the military will serve more effectively if they have practiced with civilian, semiautomatic versions of the firearms used by the military.

The right to keep and bear arms also continues to be connected to law enforcement. In many jurisdictions across the country, law enforcement relies on trained volunteers. For example, in Colorado, the Colorado Mounted Rangers is a volunteer organization of 200 citizens who provide assistance pursuant to formal agreements with over 30 Colorado Sheriffs' Offices, Police Departments, and other local governments. In 2013, they supplied 50,000 hours of services to local governments. They respond to violent crimes, prison escapes, natural disasters, backcountry search and rescue, and everything else that law enforcement officers do. Although they train to the same high standards as the Colorado State Patrol, these unpaid volunteers are not government employees and are not peace officers except when activated by the

---

[3] Since 1979, all citizens have been able to purchase DCM arms, because the requirement of club membership was held to violate Equal Protection. *Gavett v. Alexander*, 477 F. Supp. 1035 (D.D.C. 1979). Since 1996, the DCM has been the federally chartered, but private, Corporation for the Promotion of Rifle Practice and Firearms Safety. 36 U.S.C. § 40701 et seq.

20

requesting government agency. David Kopel, *The Posse Comitatus and the Office of Sheriff: Armed Citizens Summoned to the Aid of Law Enforcement*, 104 J. CRIM. L. & CRIMINOLOGY 761, 821–23 (2014).

Plaintiffs' criticism of the "militaristic messaging" of Defendants' social media posts miscasts America's firearms culture. Pl.'s Br. at 21. The constructive relationship between the right to keep and bear arms, the military, and law enforcement has existed throughout American history.

\*\*\*

## CONCLUSION

The district court's judgment should be affirmed.

Respectfully submitted,

/s/ *Erin M. Erhardt*
ERIN M. ERHARDT
  *Counsel of Record*
JOSEPH G.S. GREENLEE
NATIONAL RIFLE ASSOCIATION
OF AMERICA – INSTITUTE FOR
LEGISLATIVE ACTION
11250 Waples Mill Road
Fairfax, VA 22030
(703) 267-1161
eerhardt@nrahq.org

Counsel for *Amicus Curiae*

21

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 3,852 words, excluding the parts of the brief excluded by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in 14-point, proportionally spaced Century Schoolbook font.

/s/ *Erin M. Erhardt*
Counsel for *Amicus Curiae*

## CERTIFICATE OF SERVICE

I certify that on January 14, 2025, I served the foregoing with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

/s/ *Erin M. Erhardt*
Counsel for *Amicus Curiae*